## CHICAGO, INDIANAPOLIS AND LOUISVILLE RAILWAY COMPANY v. STIERWALT.*

[No. 12,400. Filed October 27, 1926. Rehearing denied May 18, 1927. Transfer denied June 5, 1928.]

*Writ of Certiorari to United States Supreme Court denied October 26, 1928.

C. C. Hine, Alfred Evens, William L. Taylor and George W. Henley, for appellant.

Davis & Michel and Miers & Corr, for appellee.

McMahan, P. J.—This is an action for damages under the Federal Employers' Liability Act, alleging injuries to the person of appellee while employed by appellant as a brakeman on one of appellant's trains at Clear Creek, Indiana, January 22, 1923. The complaint is in a single paragraph, but contains two charges of alleged negligence. First, the use by appellant of a car, the coupler and coupling apparatus of which was "broken, defective and inoperative and in such condition that said car could not be coupled onto an adjoining car without the necessity of someone going between the ends of said cars" in violation of the Federal Safety Appliance Act; and, second, that appellant negligently, in violation of its custom and duty to move the engine and cars under the circumstances outlined in the complaint only in response to a signal or order of appellee, in violation of said custom and duty, caused the cars to be set in motion and run onto and against appellee, injuring him so that it was necessary to amputate each of his legs between the knee and ankle. The case was tried by a jury and resulted in a general verdict and judgment in favor of appellee for $42,000.

Appellant urges as reasons for reversal: (1) That the verdict is not sustained by sufficient evidence; (2) excessive damages; (3) the giving of certain instructions; and (4) misconduct on the part of the bailiff in charge of the jury.

The evidence is sufficient to establish the following facts: Appellant operated out of its McDoel yards at

Bloomington, Indiana, a train known as the "stone train," on which appellee was working on the day he was injured. This train started from the McDoel yards in the morning, taking out of McDoel certain cars to be distributed to various industries in the Bloomington stone district. At Clear Creek, about two miles south of the McDoel yards, appellant's railroad divides, the east branch being known as the "Smithville Branch," and the west branch as the "Indiana Stone Road." Upon arriving at Clear Creek, the train crew set out the cars which were destined to industries on the Indiana Stone Road, leaving them on a side track, and took those cars which were destined to industries on the Smithville line and proceeded three miles south to Sanders, which was the southernmost point made by this train on the Smithville branch. Beginning at Sanders, it worked back north toward Clear Creek, working the various stone quarries and stone mills located on the Smithville Branch, delivering to them such cars as were destined to these quarries and mills and picking up such cars as were ready to be hauled out. The cars picked up on the Smithville branch were returned to Clear Creek, placed on a siding, and left standing there while the train worked the quarries located on the Indiana Stone Road. The train picked up the cars destined to industries on the Indiana Stone Road, and proceeded to quarry No. 17, five miles south of Clear Creek, and which was the point farthest south made by this train on the Indiana Stone Road. Beginning with quarry No. 17, the train then worked back toward Clear Creek, delivering cars to the various stone mills and quarries. On the southbound trip from Clear Creek to quarry No. 17, this train set out on a switch known as the "National Switch," and located about two miles south of Clear Creek, two cars of stone which

were destined to the Woolrey Mill, located on the National Switch. As the train worked back north on the Indiana Stone Road, it approached the National Switch from the south, carrying seven cars and the caboose. One of these cars was loaded with stone to be shipped and delivered to a point in Kentucky. The train was stopped on the main line, at a point opposite or a little south of, the derail or clearance point of the National Switch, which derail or clearance point was 148 feet south of the switch points and the switch stand. At this point the engine was cut off from the train by appellee, and the seven cars and caboose left standing on the main track while the engine went in to pick up the two carloads of stone which had been set on the National Switch on the way down. Appellant's track at this point consisted of a main track on a slight curve to the right, as one faces north, with the National Switch running off to the southeast from the main track. The switch points and switch stand are directly opposite each other, the switch points being east of the switch stand. There was a frog eighty-one feet south of the switch stand. Thirteen feet west of the main track, there was a post which was forty-four and one-half feet south of the switch stand and switch points. When the train was brought to a stop, opposite or a little south of the derail and clearance point, appellee cut off the engine from the cars and caboose and signaled the engineer to move forward. The engineer moved forward over the switch points. Appellee then signaled for the engineer to stop, which he did. Appellee crossed over from the east side of the track to the west side of the track, threw the switch, and signaled the engineer to back the engine, which the engineer did. They coupled onto the two cars on the National Switch, when, in response to a signal from appellee, the engineer proceeded with the engine and the two cars over the switch

points a second time and on a signal from appellee stopped the two cars at a point where the rear end of the two cars was north of the switch points. Appellee crossed over the track from the east side to the west side and threw the switch. At this point there is a conflict in the evidence. The engineer testified that appellee, after throwing the switch a second time, signaled for him to back up. Appellee testified that he did not give this signal, but that he walked up the track to the end of the south car and attempted to open the knuckle of the coupler by means of the lift lever. That he tried two or three times with one hand, and then with both hands, and it would not work; that he stepped in to fix it, and, just as he got in there, the car started back on him.

Appellant, in support of its first contention, says there is no evidence that the coupler was broken, or that it was defective either in type or construction; that the only evidence which would tend to indicate any defect in the coupler was the testimony of appellee to the effect that he attempted to raise it up with the pin lever and that it would not work; that, against this evidence, there was the testimony of three members of the train crew that they examined the coupler and worked the pin lever; that the coupler was not in any way defective, and that, without any change being made in the coupler, the cars did later couple by impact.

Appellee, in describing the coupler and the circumstances surrounding the injury, testified that the coupler was situated in the center of the end of the car; that there was a lift lever or rod of iron running from the center of the car to within eight or nine inches of the side of the car, and crooked down at the end of the rod; that, when the knuckles were closed, one raised up on the lever to open the knuckles, and if the coupler was in proper working order, the knuckles opened when one

lifted up on the lever; if the coupler was working properly, one ordinary pull would open the knuckle; when the knuckles on two cars are both closed, the cars cannot be coupled, but if one knuckle is open, they can be coupled, even if the other knuckle is closed; when the coupling had been made with the cars on the switch track, he signaled to go ahead on the main track, and got on the back car as the engine and cars pulled north over the switch, and when they got a little north of the switch, he signaled to stop and when the engine stopped, he crossed the track and threw the switch and lined up the main track, after which, he stepped up to the rear car which the engine had hold of and tried to open the knuckle, took hold of the pin lever and lifted on it two or three times with one hand and it would not raise, then he took hold of it with both hands and jerked up, but it would not lift; he then stepped in to fix it, to see what was the matter with it, and just as he got in there, the car started to back on him; he tried to get out of the way but got run over; that he did not give a signal to back up before stepping in to fix the coupler, and did not have any notice or warning that the engine was going to back up; in trying to open the coupler, pulled harder than usual because it would not open, tried to get out of the way when the car started to back, but did not have time and fell down over something and was run over; that a coupler that is in good serviceable order would open with one lift of the lifting rod; that the engine came back faster than he could get out of the way.

Stephen Lush testified that he had formerly been employed as brakeman and conductor and from his experience knew how couplers should operate; that if a coupler was in proper working condition, one ordinary pull of the lift rod would open it; that he would not consider a lift rod and coupler which would require two or three efforts to manipulate in proper condition. If

a coupler was in proper condition, one pull was all that was necessary. If it did not open with one effort, something was wrong.

Damon Floyd, a witness for appellant, testified that, at the time of the accident, he was assisting in surfacing the track a short distance south of the National Switch; heard the fireman call for help; when he got to the place of the accident, he noticed the coupling on the south end of the car, and to the "best of his knowledge, the coupler was open" and that the coupling between this car and the other cars was made by impact; that he was considerably excited and would not say for sure that the coupler was open.

Joseph Egnew was the conductor in charge of the train in question. He testified that after they had returned from taking appellee to the hospital at Bloomington, he examined the coupler on the car in question and found it in good condition; that he opened the knuckle and closed it, lifting it with the lever and that it worked easily; that he could not find any defect in the coupler.

William Boyer, who was a brakeman on the train on which appellee was working, testified that he was in the caboose and did not see the accident; that he made the coupling between the two cars attached to the engine and the train after the accident; that he examined the coupler at the south end of the car that ran over appellee and found the coupler to be in "perfect working order." Another one of appellant's witnesses, who was also a brakeman on the train in question, testified that after they returned from taking appellee to the hospital, he examined the coupler to see if it worked all right and that he did not find anything wrong with it.

Section 2 of the Safety Appliance Act makes it unlawful for any common carrier to have or permit to be

hauled or used on its line any car used in moving interstate traffic which is "not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." This statute imposes an absolute duty on public carriers of interstate commerce. No cars loaded or unloaded can be used in interstate traffic that do not comply with the standard prescribed by the statute. This duty is not discharged by showing the use of reasonable care in equipping cars with the required safety appliances. *Chicago, etc., R. Co.* v. *United States* (1911), 220 U. S. 559, 55 L. Ed. 582; *Delk* v. *St. Louis, etc., R. Co.* (1911), 220 U. S. 580, 55 L. Ed. 590.

Appellant contends that since its evidence shows the coupler was not actually broken and because no defect was visible, the coupler was not defective within the meaning of the statute. This contention cannot prevail. In *San Antonio, etc., R. Co.* v. *Wagner* (1916), 241 U. S. 476, 60 L. Ed. 1110, where the evidence showed that the coupling pin on a car failed to drop as it should have done at the first impact and required a manipulation in preparation for a second impact and that the draw bar on the engine was so far out of line as to require adjustment in preparation for a second impact, with testimony of an experienced brakeman as an expert that when the coupler apparatus of automatic couplers is in proper condition and the couplers are properly connected, they couple by impact automatically, it was held sufficient to sustain a finding that one or both couplers did not measure up to the standard prescribed by the safety appliance statute and in the course of the discussion near the end of the opinion, the court referring to *Texas, etc., R. Co.* v. *Rigsby* (1916), 241 U. S. 33, 60 L. Ed. 874, said:

"'A disregard of the command of the statute (Safety Appliance Act) is a wrongful act, and where it results in damages to one of the class for whose special benefit the statute was enacted, the right to recover the damages from the party in default is implied.' If this act is violated, the question of negligence in the general sense of want of care is immaterial."

In *Davis v. Minneapolis, etc., R. Co.* (1916), 134 Minn. 369, 159 N. W. 802, it appeared that a coupler would not function when the plaintiff took hold of the lever at the side of the car and made several attempts to work it. The plaintiff, being unable to work the coupler by the use of the lever, went to the end of the car to lift the coupling pin. In so doing, he stumbled and fell, and was injured. The defendant produced three witnesses who examined the coupler within thirty minutes after the accident and declared there was no defect in it. The railroad company claimed that this evidence, coupled with the physical fact that a simple mechanical contrivance like a coupler, which was in good condition before the accident and shown to be in good condition and workable after the accident, conclusively showed that it could not have been defective as claimed by the plaintiff. In reply to this contention, the court said:

"A coupler, to comply with the Act of Congress, must be one which when operated in the manner intended performs its functions under all ordinary conditions under which couplings and uncouplings are made in railroad work."

The jury evidently believed appellee when he testified that the coupler failed to operate when he attempted to lift the pin lever and that he undertook to manipulate it with his hands. No reason is suggested for appellee being between the

tracks in front of the car as it was approaching the other cars, other than that he was there for the purpose of seeing what was wrong with the coupler and for the purpose of fixing it, so as to make a coupling with the other cars. If the coupler had operated as it should have operated, there would have been no reason for him being where he was. We hold the evidence sufficient to sustain a finding that the coupler was defective, and not operative at the time appellee was injured.

Appellant's next contention is, even if it be conceded the coupler was defective and inoperative, that such defect was not the proximate cause of the injury.

In *McCalmont* v. *Pennsylvania R. Co.* (1922), 283 Fed. 736, McCalmont was foreman of car inspectors. A car with a defective coupler, standing with others on a dead track awaiting transfer to the shops for repair, had been attached to the next car by a chain. McCalmont, with a helper, went between the cars to shorten the chain, so that the car would be ready to move when the engine came for it. While he was thus engaged, another car was kicked onto the same track, and struck the string of cars there standing. McCalmont was caught between the two cars where he was standing and killed. The rules required all employees, when working about standing cars, to set out a signal flag, which he did not do. It was held that the failure to set out the signal flag was the proximate cause of the collision and of the injury, and that the defective coupler was not a cause, but only a condition. In discussing the question as to whether a defective coupler was the proximate cause, the court said:

> "We think the properly logical view of such situations, and the authoritative precedents to be discussed, fairly indicate that such accidents fall into two classes—the one where the impact of the two cars which injures the workman is a part of the

movement in which he is purposely participating; the other where this impact is rather a collision which is no part of the plan. In the former class nothing happens which was unintended or which should have been avoided. The presence of the injured person between the cars is the immediate cause of the injury, and that presence was induced by the defective coupling, which is therefore, in law, the proximate cause. In the other class of cases the unintended and unnecessary collision is the immediate cause of the injury, the presence of the injured person at the danger point is an incident or a condition, and we must therefore look to see whether the defective coupler is the cause of the collision. If so, then it is the proximate cause of the injury; otherwise it is a remote cause."

Then follows a review of the *St. Louis, etc., R. Co.* v. *Conarty, Admx.* (1915), 238 U. S. 243, 59 L. Ed. 1290, and of the *Lang Admx.,* v. *New York, etc., R. Co.* (1921), 255 U. S. 455, 65 L. Ed. 729, both of which are also relied on by appellant, and in each of which there was an unintended collision not caused by a defective coupler. In each of those cases, the collision would have occurred just the same if there had been no defective coupler.

In the *Lang Case,* a car without drawbar or coupler was standing on the siding. The injured person was a brakeman, and was riding on a second car which was being kicked upon the same siding. A collision occurred, and the brakeman was crushed between the car upon which he was riding and the defective car. It was not the intention of the train crew to disturb, couple onto, or move the crippled car. All the brakeman had to do with the defective car was to avoid it. In the Conarty Case, the injuries were received in a collision between a switch engine and a loaded freight car having no drawbar or coupler at one end, these having been pulled out while the car was in transit. This defective car was about to be placed on an isolated track for repair and

was left near the switch leading to that track while the other cars were being moved out of the way—a task taking about five minutes. At that time, a switch engine with which the deceased was working came along the track on which the defective car was standing and a collision ensued. It was dark. The deceased and his companions were not able to see the defective car until they got within forty or fifty feet of it. When they observed the car, his companions stepped to the ground, while he remained on the foot-board of the engine and was caught between the engine and the end of the car from which the coupler and drawbar were missing. The deceased and his companions were not intending to couple onto the defective car or to handle it in any way. They were on their way to do some switching at a point beyond the car. It was not claimed that the violation of the safety appliance act was a proximate cause of the collision.

In the *Louisville, etc., R. Co.* v. *Layton* (1917), 243 U. S. 617, 61 L. Ed. 931, as in the instant case, there was a deliberate attempt to make a coupling by impact with a string of cars standing on the track. Layton was standing on one of the cars for the purpose of co-operating in the coupling operation. Owing to the presence of a defective coupler, the attempt to make the coupling failed, and, as a result of the failure, the cars were pushed along the track into collision with others standing on the track. This collision was the immediate cause of Layton's injury. There was a direct chain of cause and effect—the intended coupling, the defective coupler, the unintended collision.

Was there any intervening efficient cause of appellee's injury and the failure of the coupler to operate which caused such injury? Appellant's counsel assume, as a matter of fact, that there was such an intervening cause, and, without stating what it was that constituted

such intervening cause, content themselves by making the following statement in that part of their brief devoted to argument:

"Under plaintiff's theory of how the accident occurred and taking the evidence most favorable to the plaintiff, there was an entirely independent, efficient and intervening agency, without the intervention of which the accident could not have happened. The engine and cars were standing still when the plaintiff claims that he discovered the defect and went upon the track. There is no conflict in the evidence that it was the custom and duty of the engineer to move the engine and cars in a movement of this character, only upon the order or signal of the plaintiff. The appellant could not reasonably anticipate that there would be a violation of this custom and duty upon the part of its engineer. There is not a syllable of evidence that such a thing had ever happened in the past and there is the positive testimony of the plaintiff that, during his entire experience as a railroader, the appellant company had always made such movements only in response to such a signal. If the plaintiff's theory of the evidence be accepted, the accident could not possibly have happened but for the intervention of an independent agency, and the defective coupler was a remote and not a proximate cause of the injury."

The only inference to be drawn from this argument is that the intervening cause of the injury was the negligence of the engineer in backing the cars without a signal from appellee to do so. If this contention be conceded, appellant would be liable under the Federal Employers' Liability Act. But we are clearly of the opinion that the evidence is sufficient to sustain a finding that the efficient and proximate cause of the injury was the defective coupler, and that the backing of the cars, whether with or without a signal from appellee, was nothing more than a concur-

ring cause. Indeed, the act of appellee in attempting to manipulate the coupler with his hands took place during the time the cars were being backed up to make the coupling. What appellee did was in the course of preparing the coupling apparatus so that a coupling could be effected by impact. The efficient cause of the injury was the failure of the coupler to operate and which resulted in the attempt on the part of appellee to manipulate it with his hands. The engine with the two cars were being backed for the purpose of making a coupling with the other cars. In order to effect this coupling, the coupling device had to be placed in condition so that the cars would couple by impact. Appellee, as was his duty, undertook to put the coupler in condition to make the coupling. He tried to open the coupler by means of the lifting lever. He first tried with one hand and then tried with both hands. The two cars were being backed toward the ones onto which they were to be coupled. Having failed to open the coupler by means of the lifting lever, appellee then stepped in front of the moving car and undertook to open the coupler with his hands, and, while so doing, he was injured. He may have been guilty of contributory negligence, but such negligence on his part cannot under the law be held to be the proximate cause of his injury so as to bar a recovery. *Spokane, etc., R. Co.* v. *Campbell* (1916), 241 U. S. 247, 60 L. Ed. 1125; *Otos* v. *Great Northern R. Co.* (1915), 128 Minn. 283, 150 N. W. 922; *Great Northern R. Co.* v. *Otos* (1915), 239 U. S. 349, 60 L. Ed. 322. Appellant's contention that appellee was not in the act of coupling the cars, because the distance he was from the car to which the coupling was to be made, cannot be sustained. The engine and the cars attached thereto were being backed up for the purpose of being coupled onto the other cars, and appellee, according to his testimony, was manipulating the coupler for the purpose of

effecting such coupling when the cars came together. The failure of the coupler to operate was the cause of his being in a place of danger. If the coupler had operated when he attempted to work the pin lever, there would have been no necessity for his going in between the cars and attempting to manipulate the coupler with his hands. The evidence is ample to sustain a finding that a defect in the coupler was a proximate cause of the injury to appellee. As was said by the court in *Chicago, etc., R. Co.* v. *Schendel* (1925), 267 U. S. 287, 69 L. Ed. 614, where the brakeman was attempting to detach a car:

"He went into the dangerous place because the equipment of the car which it was necessary to detach did not meet the statutory requirements especially intended to protect men in his position."

Appellant insists that the damages assessed by the jury are excessive. In order to sustain this contention, we would be required to hold that the amount fixed by the jury is so large that it cannot be explained on any reasonable hypothesis other than from prejudice, passion, partiality, corruption, or that some improper element was taken into account. *Indianapolis, etc., Traction Co.* v. *Roach* (1922), 192 Ind. 384, 135 N. E. 334; *Citizens Tel. Co.* v. *Prickett* (1919), 189 Ind. 141, 163, 125 N. E. 193. Damages are not to be deemed excessive unless it so appears at first blush, or it is apparent that some improper element was taken into account by the jury in determining the amount. *Huntington Light, etc., Co.* v. *Spell* (1916), 185 Ind. 30, 111 N. E. 311.

It has long been the rule in our federal courts that a verdict will not be set aside in a case of tort for excessive damages, "unless the court can clearly see that the jury committed some very gross and palpable error, or have acted under some improper bias, influence or prej-

udice, or have totally mistaken the rules of law by which the damages are to be assessed"; that is, "unless the verdict is so excessive or outrageous," with reference to all the circumstances of the case, "as to demonstrate that the jury acted against the rules of law or have suffered their passions, their prejudice or their perverse disregard of justice to mislead them." *Whipple* v. *Cumberland Mfg. Co.* (1843), 2 Story 661, 670.

In *Barry* v. *Edmunds* (1886), 116 U. S. 550, 565, 29 L. Ed. 729, 734, after quoting with approval the rule announced by Justice Story in the *Whipple Case,* the court said:

"In no case is it permissible for the court to substitute itself for the jury, and compel a compliance with its own view of the facts in evidence, as the standard and measure of that justice which the jury itself is the appointed constitutional tribunal to award."

While the courts of appellate jurisdiction in this state have the authority and right under the statutes to reverse a judgment on the ground that the damages assessed are excessive, or to require a remittitur, such power should not be exercised, if the action of the jury can be explained on any reasonable hypothesis other than that prejudice, passion, partiality, corruption, or some improper element was taken into consideration by the jury.

In *St. Louis, etc., R. Co.* v. *Craft* (1914), 237 U. S. 648, 35 Sup. Ct. 704, 59 L. Ed. 1160, a railway employee was injured and died about a half hour thereafter. In an action for the benefit of the surviving father, there was a verdict and judgment awarding $1,000 for the pecuniary loss to the father and $11,000 for the pain and suffering of the decedent. The state Supreme Court (115 Ark. 483, 171 S. W. 1185, L. R. A. 1916C 817), reduced the latter sum to $5,000 and af-

firmed the judgment. The Supreme Court of the United States, in referring to the contention that the award of $5,000 as damages for pain and suffering for so short a period was excessive, said:

"The award does seem large, but the power, and with it the duty and responsibility, of dealing with this matter, rested upon the courts below. It involves only a question of fact, and is not open to reconsideration here."

In *Georgia, etc., Co.* v. *Simms* (1925), 33 Ga. Ct. of App. 535, 126 S. E. 850, a verdict for $37,000 for the loss of one leg was sustained. A verdict for $25,000 for the loss of one foot was sustained in *St. Louis, etc., R. Co.* v. *Hays* (1924), 136 Miss. 701, 101 So. 548. In *McKeon* v. *Delaware, etc., R. Co.* (1924), 127 Atl. (N. J.) 34, the plaintiff was twenty-seven years old and earning $19 to $20 per week. He lost both legs, one at the knee, and the other below the knee. A verdict for $50,000 was sustained. In *Toledo, etc., Co.* v. *Miller* (1923), 108 Ohio 388, 140 N. E. 617, a verdict for $75,000 for the loss of both legs was sustained. In *American Nat. Ins. Co.* v. *Nussbaum* (1921), 230 S. W. (Tex. Civ. App.) 1102, a verdict for $30,000 for the loss of one leg was sustained. In *St. Louis, etc., R. Co.* v. *Wilson* (1924), 262 S. W. (Tex. Civ. App.) 1074, a verdict for $25,915 for the loss of one leg was sustained. In *General, etc., Car Corp.* v. *Melville* (1925), 198 Ind. 529, 145 N. E. 890, our Supreme Court sustained a verdict for $35,000 for a crushed leg and other injuries. And in *Jackson, Rec.,* v. *Rutledge* (1919), 188 Ind. 315, 122 N. E. 579, a verdict for $20,000 for the loss of one leg was held not to be excessive. In *Yazoo, etc., R. Co.* v. *Wallace* (1907), 91 Miss. 492, 45 So. 857, a verdict for $50,000 for the loss of both legs was reduced to $30,000. The Supreme Court of Nebraska in 1906 sustained a verdict for $27,500 for the loss of both legs. *Union, etc., R. Co.* v.

*Connolly* (1906), 77 Nebr. 254, 109 N. W. 368. In *Texas, etc., R. Co.* v. *Matkin* (1915), 107 Texas 125, the verdict was for $35,000.

For verdicts rendered prior to 1914 ranging from $22,000 to $30,000, see *St. Louis, etc., R. Co.* v. *Rogers* (1910), 93 Ark. 564; *St. Louis, etc., R. Co.* v. *McMichael* (1914), 115 Ark. 101; *Pittsburgh, etc., R. Co.* v. *Simons* (1907), 168 Ind. 333, 79 N. E. 911; *Woodworth* v. *Railway Co.* (1915), 170 Iowa 697; *Whitehead* v. *Wisconsin etc., R. Co.* (1907), 103 Minn. 13; *Otis* v. *Great Northern R. Co., supra.* See notes L. R. A. 1915F 308.

Damages are not to be predicated alone upon the amount which appellee could have earned, if he had not been injured. The jury was entitled to take into consideration his personal suffering, and the fact that he has been deprived of most of the privileges and enjoyments common to men of his class.

A limb may be of much greater value in one case than in another. Appellee when injured was in the prime of life and in good health. His education was limited to that furnished by our common schools, so that he was not prepared to enter upon a professional or business career calling for a technical education. He had, however, entered upon a calling where he could make use of his limited education and his physical power, endowed as he was with good health, and where there were opportunities for advancement. He was a steady worker, drawing good wages. He is no longer able to perform manual labor, and he cannot turn to clerical or business life without further qualification, which requires both time and money. His handicap through life is most serious. His damages are not susceptible of exact computation. Courts and juries will differ in fixing the amount. What courts in one state will hold excessive will not be held excessive in another state.

In view of the actual pecuniary loss that must of

necessity follow an injury of this kind to a man of appellee's age and situation in life, the physical pain and inconveniences he has suffered and which he must continue to suffer, and the present purchasing power of a dollar, we cannot say the damages awarded are such as show the jury were actuated by any improper motive.

Appellant's objection to instructions Nos. 4, 5, 14, 15, 16, 17 and 20 are highly technical, far-fetched, and not of sufficient importance to merit a discussion. Many of the objections are general in character and no attempt has been made to apply them to the instructions to which they relate. Instruction No. 7 of which complaint is made undertook to define proximate cause. In the course of the instruction, the court told the jury that:

"If an original wrong only becomes injurious in consequence of the intervention of some distinct wrongful, independent act of omission of another person, the injury is imputed to the last wrong as the proximate cause and not to that which was more remote."

While this instruction is not technically correct and should not have been given, it does not necessarily follow that its giving was reversible error. The word "of" before the word "omission" should have read "or." When all of the instructions are taken into consideration and construed as a whole and viewed in the light of the evidence, appellant clearly could not have been, and was not, harmed by the giving of this instruction. If the instruction was not as full and complete as appellant thought it should have been, it should have submitted such an instruction as would have embodied the matters which it now says should have been included in the instruction. The jury, in order to find for appellee

because of a defective coupler, was required to find the coupler did not operate as it was intended it should. With this fact found, there was no other act, either of commission or omission, disclosed by the evidence that would have justified a finding that the failure of the coupler to operate was not the proximate cause of the injury. Appellant makes no claim that there was any act of *omission* disclosed by the evidence that could have been the cause of the injury to appellee and which intervened between the failure of the coupler to operate and appellee's injury. Neither does appellant point to any act of commission, wrongful or otherwise, that intervened and which, in any way, was responsible for the injury and which broke the connection between the failure of the coupler to operate and appellee's injury. The giving of this instruction does not amount to reversible error.

Appellant says that instructions Nos. 14, 15, 17, 18, 19 and 20 given were outside of the "issuable facts given in evidence" and that the cause should be reversed because of the giving of these instructions. Many authorities are cited in support of the statement that the giving of such instructions is reversible error. Without entering upon a discussion of the legal proposition, it is sufficient to say that no attempt has been made to apply the proposition or point to the evidence, so as to show that the instructions or any of them are outside of the evidence.

In instruction No. 28, the court informed the jury, in case it found that appellee was entitled to recover damages, he was entitled "to recover full compensation for all the injuries that he has sustained as a proximate result of defendant's negligence," and, after enumerating the elements the jury might rightfully consider, told the jury if, from the facts it found, appellee should recover, the jury should use its good

common sense and judgment and assess to appellee full and adequate damages for the injuries which he sustained as the proximate result of the accident. Immediately following this, and connected therewith, the court continued his instructions by saying:

"In connection with the assessment of damages I charge you that if you should fail to find that the coupler on the car in question was defective and did not comply with the requirements of the statute in question, or should fail to find that such defective condition was in whole or in part a contributing proximate cause of plaintiff's injury, but should find by a preponderance of the evidence under the instructions heretofore given you that plaintiff's injury was proximately caused in whole or in part by reason of the negligence, if any, of the servants or employees of the defendant in connection with the movement of the engine and cars in question, and should you fail to find that plaintiff assumed the risk of injury under the circumstances in question; and should find by a preponderance of the evidence that plaintiff's negligence contributed, in part to his injury, then the plaintiff is not entitled to recover full damages, but under such a state of facts the damages should be diminished by the jury in proportion to the amount of negligence attributable to said plaintiff."

While the last part quoted is marked "Instruction No. 29," it must be considered the same as if it were a part and parcel of instruction No. 28, and when the whole of the instructions marked 28 and 29 are read together, as they must be, they correctly state the law, and are not subject to the objection that they are confusing or contradictory in character. Neither do these instructions or either of them "invite the jury to resort to vague, uncertain and speculative methods," as claimed by appellant. In *Chesapeake & Ohio R. Co.* v. *Carnahan* (1916), 241 U. S. 241, 60 L. Ed. 979, the court instructed

the jury, in case it found for the plaintiff, that, in assessing damages against the defendant,

> "They may take into consideration the pain and suffering of the plaintiff, his mental anguish, the bodily injuries sustained by him, his pecuniary loss, his loss of power and capacity for work and its effect upon his future, not however, in excess of $35,000, as to them may seem just and fair."

The plaintiff in that case was injured so that it became necessary to amputate one leg between the knee and thigh. There was a judgment in his favor for $25,000. One objection to the above instruction was that it "allowed the jury to indulge in speculation and conjecture; invited their attention to the sum of $35,000, and allowed the jury to give such sum as damages as to them seem just and fair without stating that the damages could be only such as were proved by the evidence to have proximately resulted from the negligent act complained of." In overruling this contention, the court said:

> "The objection is untenable. As we have seen, the court explicitly enjoined upon the jury that there must be a proximate and causal relation between the damages and the negligence of the company, and the reference to the sum of $35,000 was a limitation of the amount stated in the declaration. There could have been no misunderstanding of the purpose of the instruction."

Appellant also contends that the court after having once covered certain points favorable to appellee, in several other instructions, the same subject-matter was repeated, and that this constitutes reversible error. We cannot agree with this contention.

The evidence without conflict shows appellant and appellee at the time appellee was injured, were engaged

in interstate commerce, and there was no error in the action of the court in instructing to that effect.

The motion for a new trial was correctly overruled. Judgment affirmed.