**Carl WUTH, Plaintiff,**

v.

**UNITED STATES of America,**
**Defendants.**

**Civ. A. No. 2518.**

United States District Court
E. D. Virginia,
Norfolk Division.

April 10, 1958.

Sacks & Sacks, Stanley E. Sacks, Norfolk, Va., for plaintiff.

L. S. Parsons, Jr., U. S. Atty., John M. Hollis, Asst. U. S. Atty., Norfolk, Va., for defendants.

WALTER E. HOFFMAN, District Judge.

Plaintiff, a member of the United States Navy, was seriously and permanently injured as a result of an accident involving a weapons carrier or crash truck owned by the United States Navy and operated by one Gary Richard Anderson in the course of his duties and employment, and a motorcycle owned and operated by Gilbert M. Follett, on which

said motorcycle plaintiff was riding as a guest passenger.

Four young men, including plaintiff, were on authorized liberty on April 30, 1957. They elected to visit the beach in the southern end of Princess Anne County. Two motorcycles furnished the mode of transportation, each being equipped for driver and passenger. At approximately 4:50 P.M., in ideal weather, the sailors were proceeding North on State Route 615 in the direction of Oceana at a speed of 35 miles per hour. Headed in the same course on this two-lane highway, marked by a broken white line, was the 1½ ton, 1946 Dodge truck, described as a weapons carrier or crash truck. The driver, Anderson, was serving as a section leader in charge of searching for tip tanks dropped from jet planes in emergency landings when approaching the nearby Oceana Air Field. The control tower at the airport had communicated by radio with Crossland, a rider in the crash truck, and had advised the men to be on the lookout for a seldom traveled farm path leading into the open field where it was believed the tanks had been dropped. Proceeding South on Route 615 the men noticed the dirt path and continued for a distance of about one mile, where the crash truck was turned around and headed North with an intention of making a left turn off the highway into the dirt path used for farm equipment.

■■■ As the crash truck approached the place where the left turn was to be negotiated, Anderson reduced his speed and, according to him, several cars to the rear proceeded to pass after he had given a left turn hand signal. Both Anderson and Crossland testified that the driver gave the hand signal when at least 100 yards from the starting point of the left turn. Three of the sailors[1] and one disinterested witness stated that no hand signal was noted. The crash truck was not equipped with any mechanical arm signal or lights, and Crossland admitted that the canvas covering may have interfered with the ability of drivers of passing vehicles to detect the hand signal. While the Court is inclined to the view that no hand signal was given by Anderson, it is unnecessary to determine this conflict in the testimony as, assuming arguendo the defendant's theory, it is significant that at least three vehicles passed the crash truck while Anderson supposedly had his left arm extended. The fact that these automobiles apparently disregarded the signal is notice, in and of itself, that a signal given by the driver of a truck of this nature is probably ineffective. The driver, Anderson, first noticed the two approaching motorcycles at a distance estimated to be 130 feet to his rear, at which time the crash truck was then approximately 75 feet from its turning point. The truck was slowing down to about 5 to 10 miles per hour preparatory to making its turn, and the driver estimated the speed of the motorcycles at 35 miles per hour in an area where the permissible speed was 55 miles per hour. At the time the motorcycles were observed by Anderson, they were in the right lane. The driver did not again look to his rear and proceeded to make a sharp left turn to enter the farm path. When about one-half of the crash truck was off the highway, the Follett motorcycle struck the left rear of the truck. Under the law of Virginia the defendant's evidence establishes negligence on the part of the Government's driver.

Defendant urges that the negligence of the driver did not constitute a proximate cause of the accident. The motorcycle operator, Follett, testified that he had entered the passing lane with an intention of overtaking the slowly moving crash truck in the same manner as the preceding automobile had done when he noticed the truck start its left turn across the highway at a place where there were no intersecting roads. Follett, believing that he could perhaps pass to the rear of the truck, proceeded to "slant"

---

1. The fourth sailor was not present at the trial.

the motorcycle but the rear wheel brake locked and the motorcycle slid into the truck. On the basis of Follett's statement that, if the brake had not locked, it was his opinion that he could have passed to the rear of the truck, it is suggested that the locked brake was the sole proximate cause of the accident. Defendant overlooks the clear violation of the statute which prompted Follett to apply the brake in an emergency created by defendant's driver in attempting a left turn across the path of rapidly approaching traffic. As to the plaintiff, he cannot be charged with any negligence of Follett, and plaintiff is free from contributory negligence in the absence of any authority establishing that any person riding on a motorcycle is guilty of negligence as a matter of law—a point which may be debatable in the eyes of the public, but which finds no support in law.

Turning to the question of damages, we find that plaintiff has sustained an 80% loss of functional use of his left lower extremity. By reason of his service in the United States Navy, he has had no medical or hospital expense. That his left leg was not amputated is a tribute to the medical service afforded plaintiff. He will continue to receive free medical treatment at the expense of the Government and two future operations will undoubtedly be required—one for the purpose of mobilizing his own skin in place of the skin grafts—the other to perform a fusion operation which will eliminate the foot drop and brace, but will still cause plaintiff to limp. Due to instability of the knee joint occasioned by the removal of the upper two-thirds of the fibula, it is reasonably probable that plaintiff will be afflicted with traumatic arthritis in the knee joint.

The severe avulsion laceration of the left leg with avulsion of the muscles of the anterior tibial compartment, the peroneal compartment, and the severe fragmentation of the fibula, point to the seriousness of the injury sustained. A series of eight operations have already been performed, six of which have been in the plastic surgery field. The two future operations will necessitate hospitalization or disability for a total of eight months. One of these latter operations will substantially eliminate the danger of ulceration of the leg. The other operation will require plaintiff to use a larger shoe for his left foot, but will remove the necessity of wearing a brace.

Despite these injuries, the Court is not impressed with the contention of plaintiff's counsel that plaintiff's earning capacity has been substantially impaired. Prior to entering the service, he served in part-time jobs as a gas station attendant, a metalsmith, and a laborer on used car lots. He states that he had planned to become an aviation or automobile mechanic, but now hopes to be able to operate a motel upon his retirement from the Navy on medical disability. Plaintiff appears to be an intelligent young man who had completed the first half of his senior year in high school when he enlisted in the Navy. At the time of the accident he was 21 years of age and has received, and is receiving, a base pay of $159.95 per month, plus $61.10 per month by way of allowance, or a total of $221.05. Upon his release from the Navy, he is entitled to preference benefits in securing employment. While his ability to perform certain types of manual labor is undoubtedly impaired to some extent, this factor cannot be given the weight so strenuously urged by counsel. The future earning capacity may well have resulted in an ultimate benefit to the young man should he elect, upon completion of the remaining operations, to avail himself of the opportunity of higher education. For these reasons, while the Court is not disregarding some impairment of future earning ability, it is impossible to attribute any specific amount to this phase of the damages.

We are asked to fix a per diem valuation for past and future physical pain and mental anguish. While such an approach may furnish a basis for ar-

**664**

gument, it is not, in this Court's view, a proper method of computing a final award. The per diem valuation has been adopted by some district judges in arriving at ultimate damages, and such action has not been declared erroneous by one appellate court, but the approach has not yet received the approving action of any higher court as an accepted or essentially correct method.

■ In the final analysis the common-sense approach to the question of damages is more realistic. The pain, suffering and mental anguish, past and future, when considered with the life expectancy and the loss of wages, past and future, together with the inconvenience and embarrassment, are factors which must be carefully weighed in arriving at a final figure. Congress, in enacting the Federal Tort Claims Act, (28 U.S.C.A. §§ 1346, 2671 et seq.), provided that these cases would be heard in accordance with the applicable state law. The extent of damages will understandably fluctuate in different localities, with different juries and different judges.

■■ Without attaching any dollar significance to the serious and permanent injuries sustained by plaintiff, but with an obligation to return a just and adequate award under all of the circumstances, the Court is of the opinion that plaintiff is entitled to a judgment against the defendant in the sum of $35,000. The judgment order shall be subject to such credit, if any, as may be computed by reason of any pension paid or to be paid by defendant to plaintiff for his disability. Brooks v. United States, 337 U.S. 49, 53, 69 S.Ct. 918, 93 L.Ed. 1200.

■ Counsel will collaborate in the preparation of a judgment order in accordance with this opinion, which is adopted by the Court as its findings of fact and conclusions of law, and thereafter present said order for entry. Counsel for plaintiff are allowed a fee of twenty per centum (20%) of the net final recovery, payable out of the proceeds of said judgment.