Robert HANSON, Libellant,

v.

REISS STEAMSHIP COMPANY, a corporation of the State of Delaware, Respondent.

No. 1736.

United States District Court
D. Delaware.

April 8, 1960.

Oliver V. Suddard, Wise & Suddard, Wilmington, Del., for libellant.

William H. Bennethum, Wilmington, Del., and Lucian Y. Ray, McCreary, Hinslea & Ray, Cleveland, Ohio, for respondent.

RODNEY, Senior District Judge.

■ This is a libel in personam in admiralty seeking to recover damages for injuries sustained by the libellant, based on the unseaworthiness of the vessel and on negligence as well as for maintenance and cure. The facts are not complex and

sufficient findings and conclusions will be found in this opinion.[1]

On June 3, 1954 libellant, Robert Hanson, was employed as a temporary porter on the Steamer Reiss Brothers, a Great Lakes Freighter. One of his duties on board the vessel was daily to make the second and third mates' bunks, an upper and lower, in the same cabin. The upper bunk was 54″ above the deck, 38″ wide and 6′ long. Due to its height and width, it was not possible for libellant to properly and completely make the upper bunk while standing on the deck.

On June 7, 1954 libellant was standing on a chair tucking in the back of the third mate's bunk when the chair slipped from under him. He tried to catch himself but bumped his back on the edge of the bunk, resulting in injury to his back.

The accident was reported during the morning of June 7 and libellant was authorized to go to the Marine Hospital in Chicago. However, he stated he preferred to wait till the vessel reached Sheboygan, Wisconsin. He was examined by the Marine Doctor in Sheboygan on June 10, 1954. The same day he returned to the vessel and continued performing his duties, with the exception of tucking in the back of the third mate's bunk. He stated his back would no longer allow him to crawl up and bend over as he had done previously while making the upper bunk. He had pain in his back, and numbness down his right leg to his toes.

Upon leaving the vessel on June 20, he returned to his sister's home in Bailey's Harbor, Wisconsin. There he secured medical treatment from the family doctor who placed him in traction for from 4 to 6 days.

Arrangements were then made for him to enter the Chicago Marine Hospital, and he was admitted there July 27, 1954.

1. While Admiralty Rule 46½, 28 U.S.C. does not expressly provide that findings may appear in a filed opinion, as does Rule 52 of the Rules of Civil Procedure, 28 U.S.C., yet such seems an approved procedure. Hecht, Levis and Kahn v.

The S.S. President Buchanan, 2 Cir., 236 F.2d 627; United States v. Ladd, 4 Cir., 193 F.2d 929; Koehler v. United States, 7 Cir., 187 F.2d 933; Victory Towing Co. v. Bordelon, 5 Cir., 219 F.2d 540.

He remained till September 15, 1954, spending about 3 weeks in traction. He was discharged with a recommended 14-day convalescence period.

From November, 1954 to January, 1955 libellant was employed on a fur farm near Sturgeon Bay, Wisconsin. On March 5, 1955 he began employment with the Kohler Co., Kohler, Wisconsin, and he has worked there continuously since that time as a tank finisher and as a sprayer. From the time he left the Marine Hospital until he went to work for Kohler he received no medical treatment.

During his employment with the Kohler Co. he has had "two or three" heat treatments by Company doctors and has worn a back brace furnished by the Company on "seven or eight" occasions. In addition he was given pills to take and some ointment to have rubbed into his back by his wife. He had not had any treatment of any type during the year and a half prior to trial.

Before the accident complained of libellant had had no trouble with his back and had been able to perform unrestricted labor and engage in unrestricted sports activity. Since the accident his right leg has been numb at times and his back has troubled him sporadically. He has restricted his work to those jobs not requiring heavy lifting or bending of the back, and has had to forego certain sports activities.

On June 15, 1955 he brought suit in admiralty for unseaworthiness and negligence and maintenance and cure.

It is, of course, the duty of an employer in admiralty to furnish a seaworthy vessel and this includes such appliances as are pertinent to the ship and with which the seaman must perform his duties.[2]

■ Seaworthiness is a term difficult to define with precision and as applicable to varying situations. As applicable to appliances furnished to a seaman for the performance of his duty, it has been said to normally come within two categories. In Mesle v. Kea Steamship Corp., 3 Cir., 1958, 260 F.2d 747, 751, these categories are thus stated:

" * * * One is where the shipowner, having knowledge—actual or constructive—that certain activity will occur, is imposed with an absolute duty of supplying equipment for permitting the conduct and accomplishment in reasonable safety of that activity; liability is imposed for failure to comply with this duty, termed one of making the vessel seaworthy. The other category is where the equipment actually supplied by the owner for doing the ship's work proves incapable of performing its function in the manner for which it was designed."

The facts of the present case seem to be applicable to the first category and perhaps also to the second.

■ We now come to some description of the place where the libellant was injured, the facilities with which he worked and some determination of the fitness of those facilities. The cabin where the accident occurred was described as "about 7′ fore and aft and about 12′ athwartship and about 7′ high". In addition to the double-deck bunk the cabin contained two chairs, a steel desk, two chests of drawers, a wash basin and one or more throw rugs upon the deck.

When the libellant was engaged, he was instructed as to the nature of his duties, including the making up of the two bunks, but he was not particularly instructed as to the manner of performing those duties. It is in evidence that by reason of the height and width of the upper bunk it was impossible to properly "tuck in" or complete the making up of the upper bunk while standing on the deck.

2. The Osceola, 189 U.S. 158, 173–175, 23 S.Ct. 483, 47 L.Ed. 760; Brown v. Dravo Corporation, 3 Cir., 1958, 258 F. 2d 704, 706; Cox v. Esso Shipping Company, 5 Cir., 1957, 247 F.2d 629, 637; Ross v. Steamship Zeeland, 4 Cir., 1957, 240 F.2d 820.

The respondent has proved that it was the customary practice for porters in making up the upper bunk to stand upon a chair. No other facility for the accomplishment of the duties of the libellant, other than the chair, was present in the cabin or furnished by the respondent.

The respondent contends that a vessel owner is not an insurer of the safety of its employees and need not furnish the best, safest and most convenient equipment. The respondent also contends that a chair is the usual equipment used in performance of the duty in which the libellant was injured and that such chair is uniformly used on vessels of the same age, class and size as the vessel upon which the injury occurred.

I think it may be conceded that a shipowner is not an insurer and is not under duty to keep the vessel accident proof. It is, however, clearly the duty of a vessel owner to keep the vessel seaworthy, furnish it with appliances reasonably fit and competent for the performance of the duties imposed upon a seaman, and to give a seaman a reasonably safe place to work.[3]

The fact, however, that the appliance furnished was of a similar nature to appliances used on other vessels of the same class, type and age is not determinative of the performance of the duty cast upon the present shipowner. A custom may be relevant and admissible in determining the propriety of an appliance but does not in itself determine that such appliance was entirely proper.[4]

In the final analysis it is my duty to find, as to this first branch of the case, whether a chair is a proper appliance to be furnished for a seaman to stand upon for the performance of a duty where such duty cannot be performed by standing upon the floor or deck. I cannot so find. I find that the seaman was about 6' 2" in height and weighed approximately 240 lbs. The chair was "a wooden chair 15" in height with a 33" back and 4 legs." The bunk, required to be made, was 6' long, 38" wide and 54" above the deck. It is found that the bunk could not be properly or completely "made up" by the seaman standing on the floor or deck. A chair is uniformly defined as a "seat" and not as something to stand upon. The respondent draws attention to the fact that accidents similar to the present are not confined to maritime matters but happen in a home. Such fact does not establish a chair as a proper appliance to stand upon to perform a stipulated duty.

A ship is unseaworthy if injury results from inadequate appliances. I find the respondent was negligent in failing to provide proper appliances for the performance of a stipulated duty, and the vessel, therefore, was unseaworthy.

Having arrived at the conclusion that by reason of the inadequacy of the appliances and equipment the vessel involved was unseaworthy, it becomes necessary to determine the damages. These damages consist of three main items, (a) maintenance and cure to which the libellant is entitled, (b) damages for pain and suffering and (c) damages for loss of earning power, if any, by reason of the accident.

### (a) Maintenance and Cure.

The maintenance and cure to which a seaman is entitled is well defined in the law and grows out of the relationship of the seaman to the employer rather than to any unseaworthiness of the vessel or negligence of the owner.[5] It is agreed in this case that the liability for maintenance and cure is based upon the rate of $6 per day, and only the dura-

3. Brown v. Dravo Corp., 3 Cir., 1958, 258 F.2d 704, 706.

4. Troupe v. Chicago, D. & G. Bay Transit Co., 2 Cir., 234 F.2d 253, 260.

5. Farrell v. United States, 336 U.S. 511, 516, 69 S.Ct. 707, 93 L.Ed. 850.

tion of this liability is subject to present determination.

Libellant seeks compensation for maintenance and cure from the time of the accident, June 7, 1954, to March 22, 1958, being a year and a half prior to the trial, after deducting the time the seaman was still on board the vessel and the time spent in the Marine Hospital. Thus, the libellant seeks compensation for maintenance and cure for 1,320 days. The respondent admits liability for maintenance and cure but seeks to limit the liability to the date when the libellant commenced work at the fur farm.

■■ Liability for maintenance and cure does not end with the termination of the voyage but continues for a reasonable time after the right accrues and until further cure is impractical or until the need of the injured person ceases. Liability for maintenance and cure and the time of its operation depends upon the facts of each individual case.[6]

■ The injury occurred on June 7, 1954 and the libellant did not continue in the employ of the respondent after June 20, 1954. The libellant on November 1, 1954 obtained employment at a fur farm which lasted until January 1, 1955. On March 5, 1955 he was employed by the Kohler Company and had been continuously employed by that company to the date of trial. Liability for maintenance and cure does not necessarily cease when the injured person obtains gainful occupation where such employment is compelled or induced by economic necessity.[7]

■ I find the libellant's employment at the fur farm was of a temporary nature and compelled by economic necessity, and that maintenance and cure should extend from the time the libellant left the ship until he obtained the permanent position he now holds with the Kohler Company, after which the duty to furnish maintenance and cure had ceased because the seaman's need had ceased.[8] After deducting the 50 days (from July 27, 1954 to September 15, 1954 that the libellant was in the Marine Hospital) I find the liability for maintenance and cure is 208 days at $6 per day or $1,248.[9]

### (b) Damages for Loss of Earning Power.

■ The libellant claims a large amount for what is termed loss of wages and decreased earning capacity. For this purpose the libellant lists the hourly rate of pay of a stone mason (for which the libellant had once served at least a part of an apprenticeship) and upon this basis seeks a large amount as being the difference between the hourly rate of pay of a stone mason and the rate of pay the libellant received at several periods. He seeks the difference between the rate of pay of a stone mason and the amount he received at the fur farm; he seeks the pay of a stone mason during the time he was unemployed; and he seeks the difference between the rate of pay of a stone mason and the wages he received and receives from the Kohler Company. The libellant also seeks to recover this difference in hourly wages (which libellant fixes as $1.28½ an hour) during the term of his life expectancy which was proved as 40.29 years.

This method of computing damages is totally unacceptable. While the libellant had worked for his father for a time as a mason's helper, he had not been so employed for 4 years prior to his connection with the respondent. During these

---

6. Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993; Farrell v. United States, 336 U.S. 511, 518, 69 S. Ct. 707, 93 L.Ed. 850; Brown v. Dravo Corp., 3 Cir., 258 F.2d 704, 709.

7. Yates v. Dann, 3 Cir., 223 F.2d 64.

8. Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 531, 58 S.Ct. 651, 82 L.Ed. 993.

9. The libellant has indulged in rather severe strictures as to the conduct of the respondent in not paying the maintenance and cure at an earlier date. I am not aware that the record shows any prior claim by the libellant for such maintenance and cure or that such claim or need had been brought to the attention of the respondent.

4 years he worked at a shipyard and continued there until he applied for his papers preliminary to his employment by the respondent. While awaiting these papers he drew unemployment compensation. Beyond his own statement there is nothing in the record to show his qualification as a stone mason or the opportunity for such work.

Even as to his possible employment as a mason, the libellant testified that in his home community that occupation was of a very seasonal character and less remunerative than other occupations and that was the reason he secured employment in a shipyard prior to his employment by the respondent. His possible location in a different community and the prospect of employment there and the duration of such employment are matters entirely too speculative in character to form the foundation of a judgment.

It is clear from his testimony he applied for work with the respondent because he thought of making "sailing" his life career and had been told he could make more money on the ship than he could ashore.

The complaint alleges his wages from the respondent were $300 per month plus bonus and overtime. While this is denied by the answer, the time sheets of his employment by the respondent show the total wages while he was so employed were $219.74. When he left the vessel on June 20, (less than one month), I assume his pay then ceased and I assume his monthly pay was $300 or very near that figure. His annual wage as an employee of the Kohler Company for the four-year period prior to the trial (viz. 1955–58) was an average of $5,650 or about $471 per month and his average monthly salary for the portion of 1959 prior to the trial was proved to be about $450.

▮▮▮ While I have indicated that the loss of wages or earning power between what the libellant was paid on the ship and the theoretical or problematical wages he might have received as a stone mason is unacceptable as a basis for computation, yet the libellant did seem to suffer a loss of wages for some time as a direct result of the accident. This length of time must be divided into several periods.

(1) The first period extends from the time he left the ship on June 20, 1954 until he went to work at the fur farm on November 1, 1954, a total of 133 days. During this period he was unemployed. While 50 days of this period were spent by him in the Marine Hospital, which would be deductible in so far as maintenance and cure is concerned, yet the loss of wages based upon the wage payable for service aboard ship (assumed to be $300 per month) was $1,330.

(2) The second period covers the time from the commencement of his employment at the fur farm November 1, 1954 to his employment by Kohler on March 5, 1955. For two months of this period he was employed at the fur farm and from January 1, 1955 to March 5, 1955 he was unemployed due to the seasonal closing of the fur farm and his inability to obtain other work. His rate of pay on the ship during this period would have amounted to approximately $1,200. While his pay at the fur farm varied somewhat, yet from the evidence it is computed as $369.60, and the difference of wages during this period is $830.40.

(3) The third period covers the first two months of employment at Kohler when the wages there received were $26.-24 less than the wage libellant would have received aboard ship. After these two months the wages from Kohler exceeded the pay he received on the ship and there has been no subsequent loss of wages. Adding these figures it is found that his loss of wages amounted to $2,186.64.

(c) Damages for Pain and Suffering.

There is little doubt the libellant was injured in the accident which is the foundation of this action. The extent and effect of the injury may be subject to some question. Medical testimony based upon a physical examination a few

days before trial indicated the libellant suffered from a herniated intervertebral disc of a specified location which was calculated to cause pain and suffering in the past, and into the future. The libellant testified the pain in his back at times prevented his picking up objects from the floor or lifting heavy objects, and prevented his participating in sports, especially golf, as he was wont to do. When the libellant was employed by the Kohler Company he underwent some physical examination, the exact nature of which is not disclosed. It seems clear that the Kohler Company knew of some difficulty or weakness in his back and furnished a belt for use in relieving the pain. The libellant testified, however, that he had used that belt on only 7 or 8 occasions during the almost 5 years that he has worked for the Kohler Company, and that he had received no medical service or treatment of any kind during the year and a half before the trial.

■■■ The defendant is entitled to compensation for pain and suffering caused by the inadequacy of the facilities furnished to him for the performance of his duties aboard the vessel, which constituted unseaworthiness. Compensation for pain and suffering is impossible to gauge by any mathematical formula, fixed rule or standard. The amount must be ascertained by the fact-finding body as a fair and reasonable allowance for the injury sustained by the libellant as shown by the evidence, and such compensation must vary with the circumstances of each particular case. All the cases so agree. See cases collected in 15 Am.Jur., page 480; 25 C.J.S. Damages § 62, page 548.

■■■ Libellant, in his claim, specifically seeks compensation for his alleged inability to engage in sports, especially golf, as a consequence of the injury to his back sustained in the accident. For this he cites the cases listed in the footnote.[10]

While there is some division among the authorities, the great majority holds that such claim is a factor to be considered. The cases are collected in an exhaustive dissenting opinion in Hogan v. Santa Fe Trail Transportation Co., 148 Kan. 720, 85 P.2d 28 and in notes in 6 N.C.C.A.,N.S., 416 and 120 A.L.R. 535.

■■■ I am of the opinion that such claim should have consideration. I believe recovery for pain and suffering must include a recognition of any proven physical or mental suffering necessarily resulting from the injury. In District of Columbia v. Woodbury, 136 U.S. 450, 10 S.Ct. 990, 34 L.Ed. 472, an author, contributing writings without compensation, was injured so that he could not continue his writing. The Supreme Court by Justice Harlan said at page 459 of 136 U.S., at page 993 of 10 S.Ct.:

"* * * Even if those contributions were made without compensation, his inability to continue them by reason of the injuries in question was a proper element in the inquiry as to damages. That fact tended to show the extent of both his mental and physical suffering, resulting from the injuries received. All evidence, tending to show the character of his ordinary pursuits, and the extent to which the injury complained of prevented him from following those pursuits, was pertinent to the issue."

Inability to engage in sports may not, of and by itself, be a basis for recovery except in so far as it affects the mental reaction and mental suffering of the person injured and forms a part of such

10. Chicago, I. & L. Ry. Co. v. Stierwalt, 87 Ind.App. 478, 153 N.E. 807; Truschel v. Rex Amusement Co., 102 W.Va. 215, 136 S.E. 30; Hitz v. Pospychalla, 228 Wis. 614, 280 N.W. 413; Hobbs v. Employers' Liability Assurance Corp., La. App., 188 So. 191.

The authority of Chicago, I. & L. Ry. Co. v. Stierwalt, 87 Ind.App. 478, 153 N.E. 807 seems to be limited by Northern Indiana Public Service Co. v. Robinson, 106 Ind.App. 210, 18 N.E.2d 933, 936.

suffering. Some courts have used the terms "inconvenience", "embarrassment", "loss of pleasure and enjoyment of life" and "inability to engage in normal activities" as component parts to be considered in arriving at a fair and reasonable amount of damage.[11]

The quoted terms are not applicable in the present case and are cited merely as showing factors sometimes involved in what I call "pain and suffering" and especially mental suffering. There may be a number of factors considered in arriving at a just compensation, and dollar significance cannot always be attached to each.

I am of the opinion that for the pain and suffering, including the factors here present which have been sustained by the libellant in the past and may be in the future, he should be awarded the sum of $6,000.

The parties have stipulated their percentages to be used if the judgment of the court is reduced to its present worth. I think this stipulation is ineffective in this case. The findings for maintenance and cure and for loss of earning power were both based on events that had been concluded at the time of trial and were not projected into the future. The finding for pain and suffering was the only amount that is applicable to the future, and allowances for future pain and suffering are not, I think, subject to reduction to present worth.[12]

Consolidating the items herein discussed, judgment should be entered in favor of the libellant and against the respondent in the sum of $9,434.64.

An appropriate order may be submitted.

11. Wuth v. United States, D.C., 161 F. Supp. 661, 664; Fidelity and Deposit Co. of Maryland v. Bardsley, 9 Cir., 22 F. 2d 603, 605; McRae v. Metropolitan St. Ry. Co., 125 Mo.App. 562, 102 S.W. 1032, 1035; Vastano v. Partownership Brovigtank, D.C., 158 F.Supp. 477, 480.

12. Chicago & N. W. Ry. Co. v. Candler, 8 Cir., 283 F. 881, 28 A.L.R. 1174; Schir-

ra v. Delaware, L. & W. R. Co., D.C., 103 F.Supp. 812; Texas & Pacific Ry. Co. v. Buckles, 5 Cir., 232 F.2d 257. See also Borzea v. Anselmi, 71 Wyo. 348, 258 P.2d 796, 804; Braddock v. Seaboard Air Line Railroad Company, Fla., 80 So.2d 662, 666; Wolfe v. Mendel, 165 Neb. 16, 84 N.W.2d 109, 118. See also notes in 28 A.L.R. 1177; 77 A.L.R. 1451; 154 A.L.R. 801.