**Kathleen G. O'GEE, Plaintiff-Appellee,**

v.

**DOBBS HOUSES, INC., Defendant and Third-Party Plaintiff-Appellant,**

v.

**UNITED AIR LINES, INC., Third-Party Defendant-Appellee and Cross-Appellant.**

**Nos. 81 and 206, Dockets 77-7158 and 77-7189.**

United States Court of Appeals, Second Circuit.

Argued Sept. 30, 1977.

Decided Jan. 19, 1978.

Charles F. McGuire, New York City (Lipsig, Sullivan, Mollen & Liapakis, P.C., and Pamela Anagnos Liapakis, New York City, on the brief), for plaintiff-appellee.

Joseph Arthur Cohen, New York City (Alexander, Ash, Schwartz & Cohen and Sidney A. Schwartz, New York City, on the brief), for defendant and third party plaintiff-appellant.

Donald F. Driver, New York City (Haight, Gardner, Poor & Havens, New York City, on the brief), for third party defendant appellee and cross-appellant.

Before LUMBARD, MOORE and FEINBERG, Circuit Judges.

LUMBARD, Circuit Judge:

This appeal and cross-appeal arise out of an incident that took place during a United Airlines flight on April 23, 1972, as a result of which Kathleen O'Gee (now Mrs. Kathleen Collins), a United flight attendant, claimed to have suffered injuries to her back. The incident occurred when O'Gee attempted to reposition a large piece of kitchen equipment loaded on board the plane by Dobbs Houses, Inc. [Dobbs], a caterer. Defendant Dobbs appeals from a jury verdict against it in the amount of $170,000, and third-party defendant United cross-appeals from the dismissal of its counterclaim against Dobbs for indemnification of costs.

We affirm the judgment against Dobbs on the issues of liability, but remand to the district court with instructions to grant Dobbs a new trial on the issue of damages unless, within a reasonable time, plaintiff signifies willingness to accept a reduction of damages to $85,000. We reverse the dismissal of United's counterclaim.

I. FACTS

In 1968, Dobbs and United entered into a contract pursuant to which Dobbs agreed to provide the food that United would serve on flights out of Atlanta, Ga. This contract was in effect on April 23, 1972. Part of Dobbs' responsibility in Atlanta was to load food onto a cold buffet belonging to United. The buffet is a large, cabinet-like, four-drawer unit weighing between five and eight hundred pounds when loaded. After being filled, the buffet is raised to the galley section of the aircraft, where it is placed on tracks on the floor and slid into a recessed position.

Dobbs' responsibility ended when the buffet was latched in place. The locking mechanism consisted of a lever/latch on each rail of the track on which the buffet rode.[1] The levers had to be in the "up" position to permit a buffet to be removed; when the buffet was withdrawn, the levers were supposed to drop to the "down" position, permitting a new buffet to be installed. The levers would then remain down, locking the buffet in place, until they were once again raised, manually or by foot. Though this system was designed to work automatically, in that removing a buffet forced the levers down, and a new buffet could not be installed unless the levers were in the locked, "down" position, it was conceded that if the levers were, in fact, in the "up" position while a buffet was in place, the buffet would not be secure, and might slide out into the galley. Accordingly, the United Ramp Manual, which was binding on Dobbs, required a visual check of the levers, and a physical pull on the buffet, after the buffet was loaded on board, to ensure that the latches were down and that the buffet was locked in place.

On April 23, 1972, O'Gee was a stewardess on United flight # 476, a Stretch 727,

---

1. There was apparently some dispute at trial as to whether the levers were actually part of the buffet, or part of the rails, but since United concededly owned and was responsible for the maintenance of both the buffet and the rails, this issue cannot have been dispositive.

from Atlanta to New York City. That day, Dobbs was late in loading the buffet aboard the plane.[2] O'Gee watched the operation, and noted nothing out of the ordinary either then or when she soon after checked the contents of the buffet. As soon as this check was completed, the galley door was locked to bar entry by passengers during boarding. Since there was an emergency exit in the galley, however, to which access was essential, the galley door was reopened immediately after boarding.

Throughout the period of takeoff, O'Gee faced the galley and observed no one enter the area. Some five minutes after takeoff, she noticed that the buffet had slid two feet out of position, substantially blocking access to the emergency exit. O'Gee immediately sought to push the unit back into position, but failed. At this time, she "felt something pull" in her back. She then braced one foot behind her and tried again, again failing, and feeling a sharper pain in her back. A third try with the help of another stewardess failed, as did an attempt by the flight engineer. Finally, all three acting in concert succeeded in pushing the buffet back; O'Gee stepped on the locking levers to latch the buffet in place, where it remained for the rest of the flight. No report of this incident was made at the conclusion of the flight.

During the remainder of April 23, O'Gee had a "very bad backache," of which she complained to another stewardess and the flight engineer. She returned to work on April 24 and 25, but suffered pain and stiffness throughout both days. On April 26, she reported to a United medical officer, who gave her medication and requested that she return before her next flight. Over the next fourteen months, O'Gee saw several physicians, both in New York City and in Rochester, where her parents lived.

Her problem was variously diagnosed as back sprain, a slipped disk, and a herniated disk. Much of this period was spent either in bed or in therapy; attempts to resume work in July and again in October of 1972 were unsuccessful.[3] Finally, in May of 1973, O'Gee underwent a laminectomy for the removal of a herniated disk from her back. After a period of recuperation, she returned to work at United (on smaller planes than formerly) in September of 1973. Thereafter, O'Gee lost no further time from work as a result of the April, 1972, incident, and even received commendations for perfect records in 1975 and 1976.[4]

O'Gee brought suit against Dobbs, alleging that her injury was the result of the defendant's negligence in placing and securing the buffet unit on the plane. Dobbs impleaded United, claiming that any injury sustained resulted from defects in United's equipment. United counterclaimed against Dobbs for costs and counsel fees, citing the indemnity clause of its contract with Dobbs.

At trial, O'Gee did not call to testify any of the doctors she had consulted in the two years immediately following the incident.[5] Rather, she relied for her medical testimony exclusively on Dr. Leo J. Koven, who first saw her in December of 1976, but who was given access to the findings of the Rochester doctors who had recommended and performed the laminectomy, as well as to her hospital records. Dr. Koven was permitted to testify, over strenuous objection, to the opinions of other doctors O'Gee had seen, as he had learned of them through their reports, and through the history he had taken from O'Gee herself.

Following a seven-day jury trial, a special verdict was returned finding Dobbs negligent, its negligence 100% responsible for plaintiff's damages, and O'Gee entitled to $170,000. A motion to set aside the verdict

---

**2.** From this point on, the recitation of the facts is drawn from the plaintiff's case, as it must have been accepted by the jury.

**3.** It should be noted, however, that before returning to work in October of 1972, O'Gee was examined by a United medical officer, who found her to be in good health.

**4.** Plaintiff was absent from work for a period in 1974, following a February fall on the ice. This absence was concededly unrelated to this case.

**5.** One of the doctors O'Gee consulted in 1972, Dr. Jack Kapland, was called by Dobbs, and gave testimony hostile to O'Gee.

as excessive was denied; so was United's attempt to press its claim under the indemnification agreement. On appeal, Dobbs alleges:

1. That the evidence was insufficient to permit a jury verdict on the issues of Dobbs' negligence and causation;

2. That the trial court erred in making reference to the so-called 'emergency doctrine' in its charge to the jury;

3. That the trial court erred in permitting Dr. Koven to testify about other doctors' opinions; and

4. That the trial court erred in refusing to set aside the verdict as excessive.

On its cross-appeal, United alleges that the terms of its indemnification agreement with Dobbs require that Dobbs be found liable to United for any expenses incurred in defending against the third-party complaint.

## II. SUFFICIENCY OF EVIDENCE

■ By undisputed ruling of Judge Weinstein, Georgia tort law is the law of this case. Under prevailing Georgia law, there was more than the "scintilla" of evidence required to get to the jury, and enough evidence to sustain the jury verdict for O'Gee, with respect to both the duty owed by Dobbs to O'Gee, see *Davis v. Aiken*, 111 Ga.App. 505, 142 S.E.2d 112 (Ct. App.1965), and the breach of that duty, see *Cagle v. Atchley*, 127 Ga.App. 668, 194 S.E.2d 598 (Ct.App.1972). The main issue is foreseeability of injury, and it was reasonably foreseeable that an unsecured buffet might come loose, and a United employee be injured in trying to replace it.

Similarly, the question of causation is for the jury, absent overwhelming evidence. *Powers v. Pate*, 107 Ga.App. 25, 129 S.E.2d 193 (Ct.App.1962). Again, there was more than enough evidence to sustain the verdict.

Finally, we cannot say that, as a matter of law, the evidence was insufficient to permit the jury to find that Dobbs' negligent installation of the buffet was the sole cause of O'Gee injury, and that United was totally blameless.

## III. THE EMERGENCY DOCTRINE

■ Judge Weinstein's sole reference to the 'emergency doctrine' is set forth in the margin.[6] We cannot find that so brief and unstressed an instruction was error in the circumstances of this case. Plaintiff was a stewardess, rigorously trained in the safety procedures of her airline. One of the factors she must have had uppermost in her mind was the need to preserve access to emergency exits at all times during flight.

## IV. DR. KOVEN'S TESTIMONY

This allegation of error raises questions of substantially greater magnitude. Of the doctors O'Gee had consulted in the period immediately following the incident, a number were present right in New York, where the trial was held. Yet instead of calling any of these doctors, who had had a chance to examine her when both the nature of her injuries and the probability of their being sequelae of the incident would have been most apparent, she called only Dr. Koven, a doctor retained for the purposes of the litigation, and who first saw O'Gee in December of 1976, more than four years after the buffet.

It was through the testimony of Dr. Koven that O'Gee presented to the jury the opinions of the doctors she had seen in 1972 and 1973. Judge Weinstein permitted the witness to testify not only to what O'Gee had told him about her condition and its genesis, but also to what O'Gee had told him that the other doctors had told her about her injuries. Thus, Dr. Koven's testi-

---

6. [Y]ou may consider the fact that a person who is suddenly confronted by an unforeseen condition, if it's not brought about by her own negligence, may not be charged with negligence if she acts as a reasonably prudent person would act under the same circumstances, and this is so even if it appears afterwards that she did not take the safest course or exercise her best judgment.

That's really part of the same test of negligence. You have to act reasonable [sic] as a prudent person under those circumstances would have acted.

mony contained both single and multiple hearsay on crucial issues.

Prior to the adoption of the Federal Rules of Evidence, a non-treating doctor such as Dr. Koven would have been permitted to recite his patient's statements to him, not as proof of the facts stated, but only to show the basis of his opinion. W. McCormick, Evidence § 267 (1954). The Federal Rules, however, rejected this distinction as being too esoteric for a jury to recognize. 4 Weinstein & Berger, Evidence ¶ 803(4)[01]. Rule 803(4) clearly permits the admission into evidence of what O'Gee told Dr. Koven about her condition, so long as it was relied on by Dr. Koven in formulating his opinion—a foundation that was properly laid.

Nowhere does the commentary on Rule 803(4) indicate, however, whether the Rule was intended to go so far as to permit a doctor to testify to his patient's version of other doctors' opinions, particularly when no showing is made of those other doctors' unavailability. We need not reach the furthest extent of this issue, however, because Dr. Koven clearly stated that he was not relying solely on O'Gee's recollection of the other doctors' opinions, but actually had before him the reports of at least two of those doctors, and of the hospital where O'Gee's laminectomy was performed. Defendant and third-party defendant were aware of what those reports showed, and should have been prepared to counter them as best they could regardless of how testimony concerning them was introduced. In fact, it appears that portions of the hospital record were used quite effectively against Dr. Koven on cross-examination. Under the circumstances of this case, we do not think it was an abuse of discretion for Judge Weinstein to permit Dr. Koven to testify as he did. We observe, however, that while expert witnesses are to be permitted to explain the basis of their opinions, we do not here decide that that leeway extends to the kind of multiple hearsay that would have been present here in the absence of the doctors' reports.

## V. DAMAGES

Dobbs argues that the $170,000 verdict for O'Gee is excessive. We laid down the standard for review of the size of a verdict sixteen years ago:

[W]e hold we have the power to review the order of a trial judge refusing to set aside a verdict as excessive. If we reverse it must be because of an abuse of discretion. If the question of excessiveness is close or in balance, we must affirm. The very nature of the problem counsels restraint. Just as the trial judge is not called upon to say whether the amount is higher than he personally would have awarded, so are we appellate judges not to decide whether we would have set aside the verdict if we were presiding at the trial, but whether the amount is so high that it would be a denial of justice to permit it to stand. We must give the benefit of every doubt to the judgment of the trial judge; but surely there must be an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law.

*Dagnello v. Long Island Railroad Co.*, 289 F.2d 797, 806 (2d Cir. 1961) (footnote omitted). Whatever the opinion of the trial court,[7] we must make our own assessment of the evidence to determine whether there has been a denial of justice. *See Grunenthal v. Long Island Railroad Co.*, 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968); *Batchkowsky v. Penn Central Co.*, 525 F.2d 1121, 1126 (2d Cir. 1975) (Lumbard, J., dissenting); *DeMauro v. Central Gulf Steamship Corp.*, 514 F.2d 403 (2d Cir. 1975).

We believe that the denial of the motion to set aside the verdict as excessive was, in this case, an abuse of discretion. O'Gee alleged $10,000 in actual lost wages, for the fourteen months in 1972 and 1973 when she did not work. There was no

7. Judge Weinstein remarked to counsel that any verdict up to $200,000 would be permitted to stand as justified by the evidence.

evidence supporting any finding of future wage loss, since no time at all was lost as a result of the incident after September of 1973—in fact, no claim is made for such future wage loss. Moreover, any physical problems resulting from the incident have not prevented O'Gee from performing her duties as a United stewardess (albeit on smaller planes) in an apparently satisfactory fashion, and from winning commendations for reliability and perfect records in 1975 and 1976.

Indeed, when O'Gee returned to work temporarily in October of 1972, she was found to be—and certified by her signature that she agreed she was—in good health. Further evidence of this is provided by O'Gee's 1971 and 1972 tax returns that were presented to the jury. In 1971, when she was presumably working full time, O'Gee earned approximately $6982. In 1972, during which she missed five months, she earned approximately $6411. Apparently her condition did not prevent her from working substantial amounts of overtime.

On appeal, it was argued that O'Gee suffered humiliation and a loss of prestige as a result of being forced to work on smaller planes than she had formerly. Suffice it to say that we do not find this, even in conjunction with the other items of damage alleged, to justify an award of $170,000. Consequently, we conclude that Dobbs is entitled to a new trial on the issue of damages, unless O'Gee is willing to accept a reduction of the judgment to $85,000, one half of the present figure.

## VI. THE INDEMNITY AGREEMENT

■ The indemnity clause of the contract between Dobbs and United is set forth in the margin.[8] Judge Weinstein ruled, after the verdict, that the clause was not meant to apply to situations in which United was not a primary defendant, but only a third-party defendant brought in by Dobbs.

The only language in the clause that could conceivably justify that conclusion is the sentence regarding notice to Dobbs of claims against United. This clause cannot apply to claims brought by Dobbs against United, it is argued, for in those cases there is clearly no reason for United to notify Dobbs of the claims. We are not persuaded by that argument. We posit a case in which a passenger had suffered the same injury as O'Gee under the same circumstances, but was not restrained from joining United as a defendant by an employment relationship. Surely Dobbs and United would have raised as cross-claims against each other the very same claims here raised by third-party complaint and counterclaim. Does Dobbs assert that in that case, the intent of the indemnity agreement would be for Dobbs to reimburse United for its expenses in connection with defense against the passenger's claims, but not for its expenses with respect to the cross-claims?

We regard the indemnity agreement as one whereby United sought to ensure that it would not have to bear the costs of any suit to which it was a party arising out of the service of food or the loading of the buffet, unless it was found to have been grossly negligent. The result here should be the same as in *North Central Airlines, Inc. v. City of Aberdeen*, 370 F.2d 129 (8th Cir. 1966), in which the city was permitted to recover its costs from the airline under an indemnity agreement, even though the injured passenger/plaintiff had sued only the airline, which had in turn impleaded the city as lessor of its terminal.

---

8.   13. INDEMNITY: Caterer agrees to assume all risk of loss and to indemnify and hold United, its officers, agents and employees, harmless from and against any and all liabilities, demands, claims, suits, losses, damages, cause of action, fine, or judgments, including costs, attorney's and witnesses' fees and expenses incident thereto, for injuries to persons, damage or destruction of property (including property of United) arising out of or in connection with this agreement unless caused by the gross negligence or wilful misconduct of United, its officers, agents or employees. In the event that any demand or claim is made or suit is commenced against United, United shall give prompt written notice thereof to Caterer and the Caterer shall have the right to compromise or defend the same to the extent of its own interest.

■ Finally, we are not inclined to accept Dobbs' argument that United, having rested, was not entitled to seek a judgment on its counterclaim after the verdict. It is apparent that the parties had agreed to have the contract issue determined by the court after a verdict had been rendered, and that United's method of bringing the matter before Judge Weinstein as it did was eminently proper. Accordingly, we reverse the dismissal of United's counterclaim, and find that Dobbs must reimburse United for reasonable attorney's fees and other expenses incurred in litigating this action.

Affirmed in part, reversed in part, remanded in part with instructions.

FEINBERG, Circuit Judge (concurring in part and dissenting in part):

I concur in so much of the majority opinion as affirms Dobbs' liability to plaintiff Kathleen O'Gee and reverses the dismissal of United's counterclaim. I emphatically dissent from the reduction of plaintiff's damages from $170,000 to $85,000, on pain of a new trial.[1]

Plaintiff at the time of the incident complained of was 23 years old. The jury could have found—and presumably did, in view of the size of the verdict—the following: Before the injury to plaintiff's back, she was in "very good health" and had never had any back problems. Plaintiff had been "very active" and regularly skied, played tennis, used a small sailboat and enjoyed gardening. As a result of the accident, she was completely bedridden in early 1973 for a while and in severe pain. Despite the use of a back brace at this time, plaintiff was unable to straighten her back and continued to have "a lot of pain."

In May 1973, plaintiff suffered the distress, both physical and mental, and the risk of a myelogram immediately followed by a laminectomy to remove a herniated disc. After this operation, she had to "learn to walk all over again" and has been in pain every day. She cannot play tennis and has given up attempts to ski again. She took her sailboat out once but found it "too much for [her] back." She has married since the accident, but has trouble with household chores and does no more gardening.

Despite these medical procedures and a regimen of pain-producing daily exercises, plaintiff still has some numbness, mechanical disability, and recurrent pain for which she takes medication. The onset of her menstrual period increases her discomfort since her back swells and she experiences numbness running down her right leg as far as the calf. Moreover, pregnancy would assuredly aggravate her back condition. She has a 3½ inch permanent scar on her lower back. Dr. Koven testified that there was evidence of an "ongoing disability or derangement in the lower portion of the back, which was also producing pressure on the nerve root." He concluded that this condition was permanent, but that it might be relieved by a fusion operation, although such an operation is not always successful. Without a fusion, according to the doctor, plaintiff will continue to have pain. Plaintiff was 28 at the time of trial with a life expectancy of almost 50 years. As a result of this injury, she was out of work a total of 14 months and lost $10,000 in wages.

The jury found that defendant Dobbs was negligent and that its negligence caused plaintiff's injury. As a result of that negligence, plaintiff has suffered severely in the past and will do so in the future. Her life has been radically and permanently changed. She is no longer a young woman in exuberant good health able to do what she wants. Now, her activities are limited and she has pain every day, and the years ahead are not promising.

In view of the substantial past and future pain and suffering, the loss of wages, the permanent disabilities, and the loss of en-

---

1. I also do not share the majority's misgivings regarding Dr. Koven's testimony, which was clearly admissible for all purposes under Rule 803(4) of the new Federal Rules of Evidence. See Notes of Advisory Committee on Proposed Rules, Note to Paragraph 803(4).

joyment of life [2] reflected in this record, I find it hard to understand how the majority can say that the $170,000 jury verdict "is irrational or so high as to shock the judicial conscience," *Batchkowsky v. Penn Central Co.*, 525 F.2d 1121, 1124 (2d Cir. 1975). In *Batchkowsky*, we reiterated this test for the invocation of appellate remittitur after the trial judge has denied a similar motion. The reluctance to interfere with both the Seventh Amendment guarantee and the experience of the trial bench, which that test reflects,[3] is especially relevant here where Judge Weinstein, after viewing all the evidence, stated that he would have sustained a verdict of up to $200,000.[4] The jury verdict is still within the boundaries of prior cases, see, e. g., *Chiarello v. Domenico Bus Service, Inc.*, 542 F.2d 883 (2d Cir. 1976).[5] Moreover, we must be aware that whether plaintiff's recovery is $85,000 or $170,000, either sum will be subject to the ravages of inflation, about which the jury was not instructed.[6] Under all the circumstances, judicial "shock" at the larger figure but not at the former draws a line whose basis eludes me. In sum, I would affirm the amount of the jury verdict.

2. The federal courts, including this circuit, have long recognized that loss of enjoyment of life, such as inability to play tennis, ski, sail, or fully enjoy homelife activities, is a compensable element of damages. See *Lebrecht v. Bethlehem Steel Corp.*, 402 F.2d 585, 591–92 (2d Cir. 1968); *Downie v. United States Lines Co.*, 359 F.2d 344, 347 n.7 (3d Cir. 1966) (en banc); *Hanson v. Reiss Steamship Co.*, 184 F.Supp. 545, 552 (D.Del.1960).

3. *Batchkowsky v. Penn Central Co.*, supra, 525 F.2d at 1124. See also Note, Remittitur Practice in the Federal Courts, 76 Colum.L.Rev. 299, 310–11 (1976), criticizing appellate remittitur and pointing out that "[a] jury verdict becomes a tenuous thing when cloistered appellate judges feel free to tamper with it."

4. Judge Weinstein further observed that "[t]he woman has suffered very serious injuries and

suffered great pain, and I think the verdict was just."

5. In *Chiarello*, in an opinion by Judge Lumbard, we sustained a recovery for $669,910, of which $275,548 represented pain and suffering after being discounted for future value, 542 F.2d at 886 n.4. The plaintiff in that case, like plaintiff O'Gee, primarily suffered from a herniated disc. Moreover, the plaintiff in *Chiarello* only had a 32-year life expectancy whereas the plaintiff here had a 49.9-year life expectancy.

6. Whether to have so charged the jury is an increasingly disputed issue. See, e. g., *United States v. English*, 521 F.2d 63, 73–76 (9th Cir. 1975); see also Note, Future Inflation, Prospective Damages, and the Circuit Courts, 63 Va.L. Rev. 105, 122–23 (1977).