**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13019

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

SHARON ELIZABETH KEEGAN,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 4:20-cr-00045-RSB-CLR-2

_____

Before NEWSOM, GRANT, and ABUDU, Circuit Judges.

GRANT, Circuit Judge:

Federal Rule of Evidence 803(4) provides a hearsay exception for a statement that is "made for—and is reasonably pertinent to—medical diagnosis or treatment." Sharon Keegan, who took naked pictures and videos of her fourteen-year-old sister

and then sent them to her husband (both at his request and as a special "surprise"), attempted to use this Rule to solve her main problem at trial—getting her story out without also getting on the stand.

The crux of Keegan's defense was that she took the photos under duress because her husband was abusing her. Of course, getting on the witness stand and explaining that for herself would have opened her up to cross-examination, a prospect that few defendants relish. But perhaps, Keegan thought, if she told her story to a medical expert witness that expert could share her allegations with the jury, and she would be spared the risks of cross-examination.

This approach is exactly what the hearsay rules seek to prevent, and we reject the attempt to end-run the Rules of Evidence. Between the plain text of Rule 803(4), the background of the traditional rules regarding medical testimony, and the district court's factual findings in this case, we agree with the district court that because Keegan's allegations of abuse were not made "for" medical diagnosis or treatment, those statements cannot qualify for Rule 803(4)'s hearsay exception. We affirm.

## I.

In 2019, Sharon Keegan began taking naked pictures and videos of her little sister, who was fourteen. After creating these files, Keegan would upload them to Dropbox for her husband's viewing pleasure. Sometimes it was at his request; other times she uploaded out of the blue and teased him that there was a "surprise"

waiting for him in the Dropbox.  Keegan's husband could not keep some of these images and videos to himself, and eventually an undercover agent in the United Kingdom detected them online. The British agent passed the information to law enforcement officers who secured an arrest warrant for Keegan's husband and a search warrant for his residence, which he shared with Keegan, her parents, and her little sister.

At that point, the police did not yet suspect Keegan herself of any wrongdoing.  But that began to change when she told officers that she had "accidentally sent maybe four or five photos of her sister in pink panties to her husband."  And as Keegan's interview went on, investigators felt increasingly "strange" about her role in the child pornography production.

Questioning whether Keegan was "as innocent" as she was "letting on," law enforcement agents forensically analyzed her phone—which yielded even more nude images of the little sister. Testimony from both the sister and Keegan's husband confirmed abuse.  Both Keegan and her husband were charged with several crimes, including producing, possessing, and distributing child pornography; he pleaded guilty, but she did not.

Keegan's defense was that she was under duress.  She "did not have the *mens rea* to commit the offenses charged," she said, because her husband had severely abused her.[1]  Key to this defense was the expert testimony of psychologist Victoria Reynolds, who

---

[1] Keegan's husband denied the allegations at trial.

had been a full-time expert witness for a decade—but had not done any clinical work at all during that time.

Even though a hospital physician had already diagnosed Keegan with a "dissociative disorder" three years earlier, Keegan's attorney contacted Reynolds, asking her to "evaluate the impacts" of Keegan's alleged abuse "as they relate to her current legal charges." After meeting with Keegan for two days, Reynolds made the same diagnosis. She also planned to explain that Keegan's actions must be "understood as a series of complex and recognizable trauma-driven adaptations and survival strategies" and testify at length about the abuse that purportedly led to this diagnosis.

The government sought to exclude all of Reynolds's testimony as irrelevant. After the district court rejected that effort, finding the expert report "probative" of Keegan's defense, the government renewed its request on different grounds. This time, it sought to exclude only part of Reynolds's testimony—the "statements that the defendant made to Dr. Reynolds as it relates to [her husband's] alleged abuse." The government argued that these statements were inadmissible hearsay not covered by the exception in Rule 803(4). But it also conceded that the statements could still be admissible to illustrate the basis of the expert's opinion under Rule 703.

This time the district court agreed. After reviewing the record, the court concluded that Keegan's "purpose here, it's clear, was to prepare the witness to testify to a jury"—to feed Reynolds

"her story in hopes that [the] witness would then be able to tell the same story to the jury," not to obtain "diagnosis or treatment." The court also excluded the statements under Rule 403 in the alternative, explaining that their "probative value" was "substantially outweighed by the unfair and the undue prejudice that would go to the government." Seeing the writing on the wall, Keegan entered a conditional plea—guilty to one count of child pornography production, but with the right to withdraw the plea if she successfully appealed the court's evidentiary ruling.

This is Keegan's appeal. She argues that the district court erred twice over: first by incorrectly interpreting Rule 803(4) and then by unreasonably applying Rule 403. We disagree, at least on the first point. The district court did not clearly err in finding that there was no diagnostic purpose underlying Keegan's statements to Reynolds, and thus did not abuse its discretion in excluding them as inadmissible hearsay; although they were made *to* a doctor, they were not made *"for"* medical diagnosis or treatment. *See* Fed. R. Evid. 803(4). Because we conclude that the district court did not abuse its discretion, we do not address the Rule 403 argument.

## II.

We review evidentiary rulings for abuse of discretion. *United States v. Williams*, 865 F.3d 1328, 1337 (11th Cir. 2017). "Basing an evidentiary ruling on a legal error constitutes an abuse of discretion *per se*." *Id.* We review factual findings underlying evidentiary rulings for clear error. *City of Tuscaloosa v. Harcros*

*Chems., Inc.*, 158 F.3d 548, 556 (11th Cir. 1998); *United States v. Byrom*, 910 F.2d 725, 734 (11th Cir. 1990).

## III.

Hearsay testimony is generally inadmissible. Fed. R. Evid. 802. And though the term "hearsay" has perplexed law students and lawyers for decades, its core definition is simple: an out-of-court statement offered to prove that what the statement says is true. Fed. R. Evid. 801(c). Black's Law Dictionary defines it as "testimony that is given by a witness who relates not what he or she knows personally, but what others have said." *Hearsay*, Black's Law Dictionary (12th ed. 2024). An example: "My neighbor told me that she saw Bill start the fire." That testimony cannot be used to prove that Bill started the fire; the jury would be hearing from someone who heard from someone else about who started the fire. Instead, modern hearsay rules require that the neighbor testify *herself* about what she saw.

Those modern rules are the product of hundreds of years of English and then American jurisprudence, going back to the 1500s. *See* 5 John Henry Wigmore, *Evidence in Trials at Common Law* § 1364, at 12 (James H. Chadbourn ed., rev. 1974). While hearsay testimony was "constantly received" at trials throughout that century, the tide began to turn in the 1600s as the common law "steadily" began to appreciate the "impropriety" of admitting these statements as evidence. *See id.* at 17–18. By 1690, it was clear that the general rule against hearsay had "become a part of the law as

well as of the practice." *Id.* at 18. And by the mid-1700s, the "only question" was what the exceptions should be. *Id.* at 20.

The reason hearsay was generally considered unreliable (and therefore inadmissible) was plain then and remains the same today: "the other side hath no opportunity of a cross-examination." *Id.* Or as Chief Justice Kent put it more than two hundred years ago, a witness who shares hearsay testimony need not "enter into any particulars," "answer any questions," "solve any difficulties," "reconcile any contradictions," "explain any obscurities," or "remove any ambiguities"; instead, "he intrenches himself in the simple assertion that he was told so, and leaves the burden entirely on his dead or absent author." *Coleman v. Southwick*, 9 Johns. 45, 50 (N.Y. Sup. Ct. 1812). In our adversarial system, cross-examination is a fundamental proving ground—each side has the chance to put the other's witnesses to the test. But that chance disappears when the factfinder receives hearsay evidence rather than testimony from a live witness. For these reasons and more, Justice Story lamented that hearsay evidence is "exceedingly infirm, unsatisfactory and intrinsically weak in its very nature and character." *Ellicott v. Pearl*, 35 U.S. (10 Pet.) 412, 436 (1836). Chief Justice Marshall too described the "intrinsic weakness" of hearsay evidence and "its incompetency to satisfy the mind of the existence of the fact." *See Queen v. Hepburn*, 11 U.S. (7 Cranch) 290, 296 (1813).

Despite these concerns, many exceptions to the rule against hearsay have arisen—typically for statements that are "made under such circumstances that even a skeptical caution would look upon

8                    Opinion of the Court                    22-13019

it as trustworthy." 5 Wigmore on Evidence § 1420, at 252. Perhaps the most commonly known is dying declarations. These statements, which are exactly what they sound like, are presumed to be reliable because "the sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath." *Mattox v. United States*, 156 U.S. 237, 244 (1895).

Other exceptions have also emerged, including present sense impressions, excited utterances, and business records, just to name a few. *See* Fed. R. Evid. 803(1), (2), (6). What unites these hearsay exceptions and more is that the "probability of accuracy and trustworthiness" of the statements is "practically sufficient, if not quite equivalent to that of statements tested in the conventional manner."[2] *See* 5 Wigmore on Evidence § 1422, at 253.

We do not see why one exception should stand out among the others. Federal Rule of Evidence 803(4) allows a hearsay statement that "(A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." The key part of this Rule for our purposes is the requirement that the statement be "made for . . . medical diagnosis

---

[2] We see this same theme in the "Residual" hearsay exception: for a statement to qualify, it must be "supported by sufficient guarantees of trustworthiness." *See* Fed. R. Evid. 807(a)(1).

or treatment."[3] The district court's task was to decide whether that would be true for Reynolds's testimony recounting Keegan's allegations of abuse. That court said no, and we see no clear error in its factual findings and no abuse of discretion in its evidentiary ruling.

As always, we begin with the plain text of the Rule. The word "for" is used "to indicate the object, aim, or purpose of an action or activity." *For*, The American Heritage Dictionary of the English Language (5th ed. 2016); *see also* Webster's Ninth New Collegiate Dictionary (1986) ("for" is "used as a function word to indicate purpose"). Or as Black's Law Dictionary puts it: the word *for* "connotes the end with reference to which anything is, acts, serves, or is done." *For*, Black's Law Dictionary (5th ed. 1979). In short, the word "connotes intent." *Lawson ex rel. Lawson v. Fortis Ins. Co.*, 301 F.3d 159, 165 (3d Cir. 2002) (Alito, J.). And the phrase "for medical diagnosis" is there for a reason; otherwise, the exception would include any statement made to a physician that might conceivably be related to a patient's medical history.

Given the centrality of reliability and trustworthiness in the other hearsay exceptions, Rule 803(4)'s "for medical diagnosis" language, we believe, ferrets out statements whose "real use and predominating effect would be that of hearsay testimony of the patient." *See* 6 John Henry Wigmore, *Evidence in Trials at Common Law* § 1720, at 113 (James H. Chadbourn ed., rev. 1976). Such

---

[3] The parties have not disputed whether Keegan's allegations of abuse satisfy clause (B), so we will not consider that part of the Rule.

statements "should be excluded." *See id*. Rule 803(4)'s text therefore creates a tight connection between purpose ("for") and result ("medical diagnosis").

The Rule's origins reveal the reason for that connective language. Rule 803(4) codified one of our Nation's most "firmly rooted" hearsay exceptions: statements made for medical treatment. *White v. Illinois*, 502 U.S. 346, 355–56 n.8 (1992) (quotation omitted). And the justification for the exception is that the reliability of such statements "is assured by the likelihood that the patient believes that the effectiveness of the treatment depends on the accuracy of the information provided to the doctor." 2 Robert P. Mosteller et al., *McCormick on Evidence* § 277, at 431 (8th ed. 2020). A patient is "highly unlikely to lie" to her doctor, the logic goes, because if she does then she will receive faulty medical care. *See Idaho v. Wright*, 497 U.S. 805, 820 (1990). The patient's natural desire to heal bestows a "guarantee of credibility" upon her statements. *See* 5 Mark S. Brodin et al., *Weinstein's Federal Evidence* § 803.06[1], at 803–42 (2d ed. 2023). Simply put, Rule 803(4) is premised on the existence of a "selfish treatment motivation."[4] *See* McCormick on Evidence § 277, at 431.

It is true that some other subsections of Rule 803 have an explicit reliability requirement that is absent in Rule 803(4). *See,*

---

[4] In Rule 803(4), the terms "diagnosis" and "treatment" are set apart by a disjunctive "or." So of course, attempts at either diagnosis or treatment can trigger the Rule, even in the absence of the other. Indeed, many diagnoses do not require follow-on medical treatment (say, a benign mole). But whether seeking diagnosis or treatment, the patient has a strong incentive to tell the

*e.g.*, Fed. R. Evid. 803(6) (business records); 803(8) (public records). But this omission should not be surprising—reliability is inherent in Rule 803(4)'s context. A helpful comparison is the excited utterances exception, which also has no explicit reliability requirement. *See* Fed. R. Evid. 803(2). There too, the "firmly rooted" exception to the hearsay rule *inherently* carries "sufficient indicia of reliability." *White*, 502 U.S. at 355–56 n.8. The "evidentiary rationale" for both hearsay exceptions is simple: "such out-of-court declarations are made in contexts that provide substantial guarantees of their trustworthiness." *Id.* at 355. All this to say, the absence of an explicit reliability requirement in Rule 803(4) does not make reliability irrelevant.

To the contrary—an expectation of reliability is woven into the very fabric of Rule 803(4). *See id.* at 355–56 & n.8. But the same cannot necessarily be said for other hearsay exceptions with an explicit reliability requirement. Take the business records exception. *See* Fed. R. Evid. 803(6). While classic business records—"payrolls, accounts receivable, accounts payable," and the like—are "quite trustworthy," experience has shown that some records can be "calculated for use essentially in the court, not in the business." *See Palmer v. Hoffman*, 318 U.S. 109, 113–14 (1943). There is no reason to think that these latter records—the ones whose

---

truth—to help the doctor get it right. So the fact that both fall within Rule 803(4)'s exception does not mean that a statement can be made "for . . . medical diagnosis" even when its purpose is entirely unrelated to ensuring the patient's health.

"primary utility is in litigating"—are especially "reliable." *See id.* at 112, 114. By excluding them, then, the reliability requirement in the Rule 803(6) business records exception ensures that "the door to avoidance of cross-examination" is not "open[ed] wide." *Cf. id.* at 114.

Rule 803(4) does the same thing. It limits the hearsay exception to evidence that has traditionally been considered trustworthy. So for statements to be admissible under the Rule, they must be made with the purpose of seeking—in other words, "for"—medical treatment or diagnosis. And just like in other hearsay contexts, the court decides whether the party seeking to introduce the statement has "laid a proper foundation" for its admission. *See United States v. Wandahsega*, 924 F.3d 868, 880 (6th Cir. 2019); *United States v. Kootswatewa*, 893 F.3d 1127, 1133 (9th Cir. 2018); Fed. R. Evid. 104(a).

## IV.

We now examine whether Rule 803(4) applies to Keegan's statements to Reynolds about her husband's abuse. The district court concluded that she recounted the abuse "to prepare the witness to testify to a jury"—not for "diagnosis or treatment." That factual finding is reviewed for clear error, and we see none.

Keegan herself acknowledges that she sought the expert witness's opinion "principally in anticipation of litigation." Indeed, her attorney requested that the expert witness—who has not done clinical work in about a decade—evaluate Keegan's experiences "as they relate to her current legal charges." This laser focus on

litigation makes us share the district court's skepticism that Keegan's statements to her expert witness were *for* medical diagnosis.

What's more, Keegan did not consult Reynolds until after she was indicted. By the time she first spoke with Reynolds, she had spent four months in jail. And if Keegan genuinely wanted to inform the jury of her diagnosis, she needed to look no further than her own medical records—in 2018, she went to the hospital and received the same diagnosis that she got three years later from Reynolds. But that earlier physician did not know of Keegan's accusations against her husband, and therefore could not testify about them. All this goes to show that there was no "selfish treatment motivation" here. *See* McCormick on Evidence § 277, at 431.

It is not enough that Keegan asked for a medical diagnosis and got one. As the district court concluded, the medical diagnosis was not "the object, aim, or purpose" of the "action or activity." *For*, The American Heritage Dictionary of the English Language (5th ed. 2016). And, as we said, the phrase "for medical diagnosis" is there for a reason. Without it, statements like Keegan's, made to medical professionals without the true goal of seeking treatment, could be entered into evidence—all while the true source of the information evades cross-examination. *See* 6 Wigmore on Evidence § 1720, at 113. Such evasion strikes at the heart of our Nation's hearsay rules, which aim to guarantee "an opportunity of cross-examination, or to call attention to omitted facts, that if

stated might modify or completely overturn the inference drawn from the declarations as made." *State v. Medlicott*, 9 Kan. 257, 283 (1872). And rules are not simply procedural loopholes to exploit; they "guard against" the dangers that are "so liable to arise from the admission, as evidence, of declarations not made under the sanction of an oath." *Id.*

To be sure, in other cases it may be more difficult to discern why a litigant sought her medical expert. But district courts are equipped to probe whether a litigant made specific statements to a medical expert for the genuine purpose of obtaining a diagnosis or treatment. "Immersed in the case as it unfolds, a district court is more familiar with the procedural and factual details and is in a better position to decide many evidentiary and similar issues." *United States v. Shamsid-Deen*, 61 F.4th 935, 943 (11th Cir. 2023) (quotation omitted). Here, the district court did not clearly err in finding that Keegan's statements of abuse to her expert witness were not made *for* medical diagnosis or treatment.

Keegan protests that the Advisory Committee on Evidence Rules' Note to Rule 803(4), published in 1972, requires a different understanding of the Rule. But while the Committee's Notes are typically afforded "great weight," they are "not binding." *See Horenkamp v. Van Winkle & Co.*, 402 F.3d 1129, 1132 (11th Cir. 2005) (quotation omitted). And they can be discounted when their foundation has been eroded. Here there is good reason to ignore the Note even apart from its atextual hostility to the reliability

standards inherent in the traditional rule: its rationale is contradicted by a later amendment to the Rules of Evidence.

The Note says that statements made to "a physician consulted only for the purpose of enabling him to testify" are admissible under Rule 803(4). *See* 1972 Advisory Committee Notes on Rule 803. Under "[c]onventional doctrine," though, those statements were "not admissible as substantive evidence." *Id.* That means that the jury could not consider the statements for their truth. *See United States v. Kent*, 93 F.4th 1213, 1216 (11th Cir. 2024). But the expert witness *was* allowed to use the statements to explain "the basis of his opinion." *See* 1972 Advisory Committee Notes on Rule 803.

A concrete example clarifies the difference. Suppose Reynolds testified as follows: "Based on what Keegan told me about the abuse she suffered, I diagnosed her with dissociative identity disorder." Under the conventional doctrine, the jury could not consider Keegan's allegations of abuse as "substantive evidence"—that is, as proof that she was abused. Instead, it could consider the allegations only as the "basis" of Reynolds's testimony—that is, take account of the fact that Keegan's allegations were the reason Reynolds diagnosed Keegan with the disorder.

The 1972 Note—but not the Rule itself—treated litigants' statements to expert witnesses as substantive evidence, rejecting that traditional distinction. Why? The Committee said it was "one most unlikely to be made by juries." *See id.* But that rationale no

longer holds up. Federal Rule of Evidence 703 now "demands that juries make the exact distinction that the 1972 Advisory Committee's Note says they cannot." Paul W. Kaufman & Christopher J. Merken, *Toward a Presumptive Admission of Medical Records Under Federal Rule of Evidence 803(4)*, 64 B.C. L. Rev. 567, 585–86 n.85 (2023).

Rule 703 deals with the proper bases of an expert witness's opinion testimony. Before 2000, there was judicial and scholarly disagreement about "how to treat inadmissible information when it is reasonably relied upon by an expert in forming an opinion." *See* 2000 Advisory Committee Notes on Rule 703 (collecting cases and scholarship). Some argued that the rules governing expert testimony should account for the "fine but important distinction" between an expert's opinion (which is substantive evidence) and the basis of that opinion (which is not). *See* Ronald L. Carlson, *Policing the Bases of Modern Expert Testimony*, 39 Vand. L. Rev. 577, 584–86 (1986). Others disagreed, contending that the "charade that opinions and their bases are severable should end." *See* Paul R. Rice, *Inadmissible Evidence as a Basis for Expert Opinion Testimony: A Response to Professor Carlson*, 40 Vand. L. Rev. 583, 596 (1987). Taking the 1972 Note to Rule 803(4) seriously would seem to require adopting the latter approach—refusing to trust juries to distinguish between substantive evidence and basis-of-opinion evidence.

But that is not what happened. In fact, the 2000 amendment to the text of Rule 703 did the opposite: it established that "hearsay

22-13019                Opinion of the Court                17

relied upon by an expert is admissible only to establish the basis of that expert's opinion and not as substantive evidence." Kaufman & Merken, 64 B.C. L. Rev. at 585–86 n.85; *see Henderson v. Ford Motor Co.*, 72 F.4th 1237, 1243 (11th Cir. 2023). Given the contradiction between this amendment and the 1972 Note, we have little reason to afford the Note its ordinary persuasive value.[5]

We acknowledge that the result here puts us at odds with some of our sister circuits. *See O'Gee v. Dobbs Houses, Inc.*, 570 F.2d 1084, 1089 (2d Cir. 1978); *United States v. Iron Shell*, 633 F.2d 77, 83 (8th Cir. 1980); *Morgan v. Foretich*, 846 F.2d 941, 950 & n.18 (4th Cir. 1988); *United States v. Farley*, 992 F.2d 1122, 1125 (10th Cir. 1993). But the most recent of these decisions was over three decades ago—seven years before the relevant amendment to Rule 703. And, with respect, none grapples with the text of or justification for Rule 803(4). Instead, they home in on the Advisory Committee Note and matter-of-factly state that "Rule 803(4) abolished the common-

---

[5] It is fair to wonder why the Advisory Committee did not update the Note to Rule 803(4) when it amended Rule 703. The likely reason is the Committee's enabling rules, which establish that the Committee's mandate is to "consider proposed new and amended rules (together with committee notes)." *See* Jud. Conf. of the U.S., *Procedures for the Judicial Conference's Committee on Rules of Practice and Procedure and Its Advisory Rules Committees* § 440.20.30(c). The Committee "reads this rule as *not* authorizing it to make changes to the Advisory Committee Notes unless they coincide with a rule amendment." Kaufman & Merken, 64 B.C. L. Rev. at 587 & n.93. And because there has not been any "substantive change to Rule 803(4) since 1972," the Committee "could not have amended Rule 803(4)'s 1972 Advisory Committee Note when it amended Rule 703 in 2000." *Id*. at 587–88.

law distinction between the doctor who is consulted for the purpose of treatment and an examination for the purpose of diagnosis only." *See Farley*, 992 F.2d at 1125 (alteration adopted and quotation omitted); *Morgan*, 846 F.2d at 950; *Iron Shell*, 633 F.2d at 83; *O'Gee*, 570 F.2d at 1089.  That approach both ignores the meaning of the Rule, and strips the district court of its ordinary authority to make factual judgments in evidentiary rulings.  And as we have explained, the Note cannot carry the weight those courts put on it.  Again, the 2000 amendment to Rule 703 *requires* juries to make exactly the same distinction that the Note says they cannot handle.  We decline to rest our decision on the Note, and use the text of the Rule instead.

Given the circumstances underlying Reynolds's proffered testimony, we see no clear error in the district court's finding that Keegan did not seek out a medical expert to obtain a diagnosis. And given the ordinary meaning of the word *for*—"not to mention common sense"—the district court did not abuse its discretion in concluding that Keegan's statements do not qualify for the hearsay exception in Rule 803(4).  *See Abramski v. United States*, 573 U.S. 169, 179 (2014).

★    ★    ★

To be clear: some statements made to medical expert witnesses will qualify for the hearsay exception in Rule 803(4).  In deciding which ones do, courts must consider, among other things, the text of the Rule, the context surrounding the statement, and the facts of the case.  Given these considerations, Keegan's

22-13019               Opinion of the Court                    19

statements of abuse to her expert witness were not "for" medical diagnosis.  We **AFFIRM**.

22-13019            NEWSOM, J., Concurring            1

NEWSOM, Circuit Judge, concurring:

I concur in the Court's decision and join its opinion. I write separately merely to highlight a nuance that, to me, makes all the difference.

The object of the interpretive inquiry here is Federal Rule of Evidence 803(4). In relevant part, that Rule establishes an exception to the prohibition against hearsay evidence for "[a] statement that is . . . made for—and is reasonably pertinent to—medical diagnosis or treatment . . . ." Fed. R. Evid. 803(4). The question, as the Court has well explained, is whether Sharon Keegan's "statement[s]" to Dr. Victoria Reynolds were made "for . . . medical diagnosis."

Keegan's theory, as I understand it, is that, yes, of course she made her statements to Dr. Reynolds "for . . . medical diagnosis": She wanted a diagnosis, and she got one—and that's all Rule 803(4) requires. The fact that she might *also* have made those statements "for" later use in litigation, Keegan says, is neither here nor there, because a person sometimes speaks "for" more than one reason—and by its terms, the Rule doesn't foreclose the possibility that she might have had dual motives.

Cards on the table, I don't think Keegan's position can be ruled out as a matter of pure, sterile semantics. She can credibly contend that her reading is consistent with both Rule 803(4)'s "plain text" and the leading dictionary definition of the word "for"—as "indicat[ing] purpose or aim." *Hoever v. Marks*, 993 F.3d 1353, 1357 (11th Cir. 2021) (en banc) (citing dictionaries); *accord id.*

at 1366 (Newsom, J., concurring in part and dissenting in part) (agreeing that, when used as it is here, the word "for" indicates "purpose," "an intended goal," or "object"). Because, Keegan's argument goes, she talked to Dr. Reynolds for two reasons, one of which was to obtain a medical diagnosis, her statements fit within the Rule's terms.

But—and it's a big but—the sheer fact that Keegan's reading of the Rule is "linguistically plausible" doesn't make it right. *See Ruiz v. U.S. Att'y Gen.*, 73 F.4th 852, 864 (11th Cir. 2023) (Newsom, J., concurring). And that's because "proper textualism" isn't wooden "literalism." *Id.* The aim of the interpretive enterprise isn't to isolate the clinical, classroom meaning of a particular string of words. It's subtler, richer: Here, we're seeking to discern, as best we can, how a real-life, flesh-and-blood individual would *understand* the phrase "statement . . . made for . . . medical diagnosis"—in particular, how he would understand that phrase as used in the context of a compilation of rules regulating the admission and exclusion of hearsay evidence.[1] And although that question is ultimately empirical, it seems to me inconceivable that anyone encountering that phrase would understand it to refer to a statement like Keegan's—one made for the immediate purpose of obtaining a medical diagnosis but with a longer-term view to using

---

[1] Whether the target individual in this context is an ordinary citizen, an ordinary lawyer, or (even) an ordinary district court judge, I'm not quite sure. It's an interesting question, but not one, I think, whose resolution is necessary here.

22-13019                 NEWSOM, J., Concurring                 3

it in litigation. Every ounce of pertinent context—structural, historical, etc.—weighs against Keegan's mechanical interpretation.

As the Court's opinion helpfully recounts, the Federal Rules' hearsay provisions didn't just apparate, Harry-Potter-like. Rather, they arose out of centuries' worth of discussion and debate—not only about the risks of hearsay statements but also the limited circumstances in which some such statements might, despite their out-of-court-ness, be sufficiently trustworthy to warrant admission. *See* Maj. Op. at 6 *et seq*. And as the Court quite rightly points out, the thread that binds the traditional hearsay exceptions together—their animating justification, if you will—is that they cover statements that, by their very nature, indicate reliability. *See id*. at 7–8. That is clear not only from the history of the exceptions' reception and adoption, but also from their enumeration in the Federal Rules. So, as the Court notes, several of Rule 803(4)'s closest neighbors memorialize exceptions for statements that, by their very nature, give rise to a strong presumption of reliability—*e.g.*, "present-sense impression[s]," "excited utterance[s]," and statements regarding "then-existing mental, emotional, or physical condition[s]." *See* Fed. R. Evid. 803(1), (2), (3). And conspicuously, some of the more prominent hearsay exceptions applicable to statements whose reliability might *not* be inherent—*e.g.*, business and public records—explicitly prescribe a "trustworthiness" requirement. *See id*. 803(6), (8).

The historical and structural context is thus unmistakable: One way or another, the hearsay exceptions reflect an evident insistence on reliability. Call it what you will—context, manifest purpose, common sense, etc.—but that backdrop matters. To be clear, though—because the distinction is to my mind absolutely essential—it matters *not* (as the pragmatist might contend) because it provides a basis for ignoring or even discounting Rule 803(4)'s terms, but rather because it informs the way an actual person in the real world would process and *understand* those terms. The Court's reading of the Rule—namely, that it applies to statements made with the aim of obtaining a medical diagnosis *for its own sake*—squares perfectly with the available context, and thus with a proper understanding of the provision's text: A person can be expected to speak truthfully to a doctor when her own health is at stake. Keegan's interpretation, by contrast—that the Rule also covers statements made for the purpose of obtaining a medical diagnosis *that was itself sought for use in litigation*—defies the lessons of context, and thus (again) the proper understanding of the provision's text: There's no particular reason to presume the trustworthiness of a statement that an aspiring litigant makes with one eye on the courtroom.

So even if Keegan's interpretation of the phrase "made for . . . medical diagnosis" can (as I think it can) claim consistency with the literal, dictionary-driven *meaning* of Rule 803(4)'s terms, it has no footing in—and indeed, is irreconcilable with—the real-world, ordinary *understanding* of that phrase, as used in context. And that, to me, is dispositive.